# Exhibit 1

Exhibit 1

# MASTER LOAN SALE AGREEMENT

This MASTER LOAN SALE AGREEMENT (this "Agreement"), is made effective as of ___May___ __7__, 20_17_ ("Effective Date"), by and between __ICG10 Capital, LLC__, a __Florida Limited Liability Company__ for itself and on behalf of any and all lending "funds" sponsored by it and/or any parties controlled by, under the control of or in common control with it (collectively, "Seller"), and PS FUNDING, INC., a Delaware corporation, and its designated assignee ("Buyer"). Capitalized terms that are not otherwise defined herein shall have the meanings ascribed to them in Article 1 of this Agreement.

## RECITALS

Seller is the holder of the Loans, with each such Loan being evidenced, secured, and/or guaranteed by the Loan Documents applicable thereto, as such Loan Documents are more particularly described in the Loan Purchase Certificate for the Loan(s) in question.

From time to time, Buyer desires to purchase and assume from Seller, and Seller desires to sell and assign to Buyer, all of Seller's right, title, and interest in and to one (1) or more of the Loans (as evidenced by the Notes and other Loan Documents applicable to the Loans in question), and any and all of the Seller's rights, duties, and obligations that may exist with respect thereto, on a servicing-released basis, pursuant to the terms and conditions of this Agreement and the applicable Loan Purchase Certificates.

## AGREEMENT

NOW, THEREFORE, in consideration of the foregoing and for other good and valuable consideration, the sufficiency of which is hereby acknowledged, Seller and Buyer agree as follows:

## ARTICLE 1   – DEFINED TERMS

As used herein and/or in any Loan Purchase Certificate, the following terms shall have the following meanings. Whenever the context of this Agreement and/or any Loan Purchase Certificate requires, references to the singular number shall include the plural, and the plural shall include the singular, where appropriate; words denoting gender shall be construed to include the masculine, feminine, and neuter where appropriate; and specific enumeration shall not exclude the general, and shall be considered as cumulative.

Section 1.1    "Accepted Servicing Practices" shall mean, with respect to any Loan, those mortgage servicing practices of prudent business purpose residential mortgage lending institutions which service mortgage loans of the same type as such Loan in the jurisdiction where the related Collateral is located, including, without limitation, mortgage servicing practices that comply with any applicable laws and regulations and any applicable insurer or guarantor requirements in respect of a Loan.

Section 1.2    "Appraisal" shall mean, with respect to any Loan, an appraisal of the value of the related Property that was made, and signed within three (3) months of the Loan

Exhibit 1

origination date that meets the requirements of Title XI of FIRREA, and prepared by a Qualified Appraiser. All appraisals shall be written, in form and substance, to (i) USPAP standards or (ii) satisfies applicable legal and regulatory requirements. If the Loan provides for a holdback of loan proceeds to be used for rehabilitation or repair of the Property, the appraisal shall be based on the "as repaired" value of the Property (i.e., assuming completion of all repairs contemplated by Seller); and if the Loan does not provide for such a holdback, then the appraisal shall be based on the Property's "as is" value.

Section 1.3    "Borrower" or "Borrowers" shall mean, with respect to the Loan in question, individually and collectively, as applicable, those certain borrowers under such Loans, as identified on Schedule 1 attached to the Loan Purchase Certificate for such Loan.

Section 1.4    "BPO"  shall mean, with respect to any Loan, a broker's price opinion of the "as is" fair market value of the related Property given by a licensed real estate agent or broker acceptable to Buyer, incorporating an interior inspection of the residence on such Property and obtained by or on behalf of Seller or Buyer in conformity with customary and usual and business practices.

Section 1.5    "Business Day" shall mean any day which is not a Saturday or Sunday and is not a public holiday in California, or a day on which businesses are required or requested to close by government proclamation.

Section 1.6    "Buyer's Platform" shall mean one or more online platforms or websites operated by Buyer or an affiliate of Buyer, including, without limitation, the platform located at peerstreet.com and operated by Peer Street, Inc., a Delaware corporation.

Section 1.7    "Closing" shall mean, for the Loan in question, the consummation of the transactions set forth herein and contemplated in a Loan Purchase Certificate for such Loan, and, without limitation, shall not occur unless and until Seller has received the entirety of the Purchase Price for such Loan pursuant to the terms and conditions of this Agreement and such Loan Purchase Certificate.

Section 1.8    "Closing Date" shall mean, for the purchase of a particular Loan, the date on which the Assignment of Security Instrument assigning the beneficial interest in such Security Instrument to Buyer for such Loan is recorded in the Official Records of each and every County and State in which the Property securing such Loan is located, which shall in no event be later than the Scheduled Closing Date applicable to such Loan, unless otherwise agreed to by Buyer and Seller in writing.

Section 1.9    "Collateral" shall mean, for a particular Loan, any and all real and/or personal property securing the indebtedness and other obligations of the Borrowers and/or Guarantors under such Loan, including without limitation, the Properties encumbered by such Loan.

Section 1.10        "Crowd Investors" shall mean any investor to whom Buyer advertises loans and/or from whom Buyer solicits investments, whether on Buyer's Platform or otherwise.

Exhibit 1

Section 1.11          "Diligence Period"  shall mean, for the Loan in question, a period commencing upon delivery of the complete Loan File and ending on the date on which the Loan Purchase Certificate is fully executed.

Section 1.12          "Guarantor" or "Guarantors" shall mean, with respect to the Loan in question, individually and collectively, as applicable, any guarantor, surety, or other Person (other than the Borrowers) that has guaranteed the indebtedness and/or obligations, in whole or in part, of the Borrowers, and any of them, under such Loan.

Section 1.13          "Guaranty" shall mean, with respect to the Loan in question, any and all instruments and/or agreements evidencing Guarantor's obligations in respect of his, her, and/or its guaranty of such Loan.

Section 1.14          "Loan" or "Loans" shall mean, individually and collectively, as applicable, the loans made to each of the Borrowers identified in the Loan Purchase Certificates applicable to such loans, as evidenced by the Loan Documents applicable thereto and referenced on Schedule 1 of the Loan Purchase Certificate in question, which Schedule 1 shall be attached to such Loan Purchase Certificate and made a part hereof and thereof.

Section 1.15          "Loan Documents" shall mean, with respect to the Loan in question, the Note, Security Instrument, Guaranty (if any), security agreements, loan agreements, pledge agreements, assignments, and any and all other written agreements made in connection with such Loan, together with all extensions, modifications, supplements, and amendments thereto or restatements thereof.

Section 1.16          "Loan File" shall mean, with respect to the Loan in question, the documents and correspondence in Seller's possession with respect to such Loan (including documents and correspondence from the Borrower, and Borrower's agents and representatives used by Seller in connection with its underwriting and origination of such Loan) that Seller reviewed or considered in connection with Seller's underwriting and origination of such Loan, including, but not limited to, as may be applicable to such Loan, the Loan Documents, appraisals, credit applications, credit reports, final internal credit memoranda, audits, environmental reports, financial statements, insurance on collateral, title reports or title commitments, complete and current credit information regarding Loan collateral value, factual information bearing on the creditworthiness of the Borrower or any Guarantor, any other credit, due diligence material and other information concerning Borrower, the Collateral, or any Guarantors of such Loan.

Section 1.17          "Loan Purchase Certificate" shall mean an agreement in the form attached hereto as Exhibit "A", or as otherwise agreed in writing by the Parties.

Section 1.18          "Note" or "Notes" shall mean, with respect to the Loan in question, individually and collectively, as applicable, the promissory note(s) made by a Borrower evidencing the indebtedness owed under such Loan.

Exhibit 1

Section 1.19        "Party" shall mean a signatory to this Agreement.

Section 1.20        "Parties" shall mean Buyer and Seller, collectively, as signatories to this Agreement.

Section 1.21        "Person" shall mean any individual, corporation, limited liability company, partnership, joint venture, trust, or unincorporated organization, any other person or entity, and any federal, state, county or municipal government or any bureau, department or agency thereof and any fiduciary acting in such capacity on behalf of any of the foregoing.

Section 1.22        "Property" or "Properties" shall mean, with respect to the Loan in question, individually and collectively, as applicable, the real property Collateral (if any) securing the obligations of Borrowers and/or Guarantors under such Loan.

Section 1.23        "Purchase Price" shall mean, with respect to a particular Loan, the Purchase Price for such Loan as set forth on Schedule 1 attached to the Loan Purchase Certificate for such Loan.

Section 1.24        "Qualified Appraiser" shall mean, with respect to each Loan, an independent appraiser, duly appointed by Seller or Buyer, who had no interest, direct or indirect, in the related Property or in any loan made on the security thereof, and whose compensation is not affected by the approval or disapproval of the Loan, and licensed or certified by the applicable governmental body for the jurisdiction in which the related Property is located.

Section 1.25        "Repurchase Price" shall mean, with respect to any Loan, a price equal to (i) the unpaid principal balance of such Loan as of such date of determination, plus (ii) accrued interest thereon from the date to which interest had last been paid and distributed to Buyer through the date of such repurchase, plus (iii) the amount of any outstanding advances owed to any servicer, plus (iv) Buyer's expenses incurred in transferring such Loan, including, without limitation, expenses incurred for maintenance and repairs, assessments, taxes and similar items, and (v) all reasonable out-of-pocket costs and expenses incurred in the enforcement of Seller's repurchase obligation hereunder.

Section 1.26        "Scheduled Closing Date" shall mean, with respect to the Loan in question, the date that is three (3) Business Days following the mutual execution of the Loan Purchase Certificate or such earlier date as Buyer and Seller may mutually agree.

Section 1.27        "Security Instrument" shall mean, for the Loan in question, individually and collectively, as applicable, any deed of trust, mortgage, or other instrument creating a lien on any real property Collateral securing such Loan.

Section 1.28        "Seller Loan Policy" an irrevocable title commitment, preliminary title report, or an attorney's opinion of title and abstract of title, each of which must be in form and substance acceptable to prudent mortgage lending institutions making mortgage loans in the area wherein the Property is located or an ALTA lender's title insurance policy

Exhibit 1

or other generally acceptable form of policy or insurance acceptable to Buyer and each such title insurance policy is issued by a title insurer acceptable to Buyer and qualified to do business in the jurisdiction where the Property is located, insuring Seller, its successors and assigns, as to the first priority lien of the Security Instrument in the original principal amount of the Loan, subject only to encumbrances permitted by the Loan Documents.

Section 1.29        "Servicer" FCI Loan Services, or any other servicer designated by Buyer, in its sole discretion.

Section 1.30        "Title Company" the title insurance company issuing the Seller Loan Policy.

<h2 style="text-align:center">ARTICLE 2   – PURCHASE AND SALE OF LOANS</h2>

Section 2.1        Offer; Right of First Offer.  By entering into this Agreement, Buyer is not obligating itself to purchase (or offer to purchase) any Loan and Seller is not obligated to sell (or offer to sell) any Loan.  Seller and Buyer shall become obligated to sell/purchase a Loan, subject to the terms and conditions of this Agreement (including without limitation, satisfaction of all conditions precedent to the Closing of such sale), when Buyer and Seller mutually execute a Loan Purchase Certificate for the Loan in question.  Notwithstanding the foregoing, Seller shall not offer to sell any Loan to any other Person without first offering to sell any such Loan to Buyer.

Section 2.2        Initial Loan Approval.  Buyer shall have three (3) Business Days from the date on which the complete initial loan information is uploaded to the website located at www.lender.peerstreet.com to request the Loan File for the Loan (the "Initial Loan Approval"). Buyer's failure to timely deliver the Initial Loan Approval to Seller shall be deemed to constitute Buyer's rejection of the offer.  In the event of Buyer's rejection of such offer, Seller shall have the right to consummate the transaction in accordance with the terms set forth in the offer (or on such other terms as shall not be materially less favorable to Seller).  Following the Initial Loan Approval, Buyer shall be permitted to publish information about the Loan on Buyer's Platform or otherwise distribute information about the Loan to Crowd Investors for the purpose of soliciting investment in the Loan.

Section 2.3        Delivery of Loan File.  Within two (2) Business Days following the Initial Loan Approval, Seller shall: (a) electronically provide or make available the applicable Loan File to Buyer for Buyer's review in connection with Buyer's proposed purchase of a Loan.

Section 2.4        Acceptance of Offer and Closing Date.

2.4.1        If Buyer elects to proceed with the purchase of the Loan, Buyer shall prepare and deliver the Loan Purchase Certificate bearing Buyer's signature to Seller, within ten (10) Business Days following the delivery of the items described in Section 2.3 above. Seller shall have two (2) Business Days to return a countersigned version of the Loan Purchase Certificate to Buyer or elect not to proceed with the Loan sale, which time period may be extended buy Buyer in its sole discretion. Buyer's failure to

Exhibit 1

timely deliver the Loan Purchase Certificate to Seller shall be deemed to constitute Buyer's rejection of the offer.  Buyer may deliver, or refrain from delivering, an Initial Loan Approval, and/or Loan Purchase Certificate to Seller for any reason or no reason, as determined by Buyer in its sole and absolute discretion.

2.4.2      Upon and subject to the terms and conditions of this Agreement and the Loan Purchase Certificate for the Loans in question, and in consideration of the Purchase Price for said Loans, upon the Parties' mutual execution of a Loan Purchase Certificate Seller shall be deemed to have agreed to sell and to assign to Buyer, and Buyer shall be deemed to have agreed to purchase, accept, and assume from Seller, on the terms and conditions set forth herein and in such Loan Purchase Certificate, all of Seller's right, title and interest in, to, under, and concerning the Loans identified in such Loan Purchase Certificate.

2.4.3      The Closing shall occur on the Scheduled Closing Date.  If the Closing Date for a particular Loan has not occurred on or prior to the date which is twenty (20) days after the mutual execution of the Loan Purchase Certificate applicable to such Loan, then the Loan Purchase Certificate, to the extent applicable to such Loan, shall terminate, and following Seller's request, Buyer shall deliver to Seller, or discard, all information, reports, data, and other materials that Buyer and/or Buyer's agents, consultants, or employees discover, obtain, or generate in connection with, or resulting from, Buyer's inspection and investigation of such Loan, the Loan Documents for such Loan and the Collateral securing such Loan, except one copy to be retained for audit and regulatory compliance purposes.

Section 2.5      Diligence.

2.5.1      During the Diligence Period for each Loan, Buyer shall review, inspect, and investigate, (or shall have affirmatively chosen not to obtain, review, inspect, or investigate) each and every aspect of the Loan in question, the Loan Documents for such Loan, the Property securing such Loan, all other Collateral securing such Loan, and all other documents, instruments, statements, records, returns, agreements, information, and other matters delivered by Seller to Buyer, or otherwise made available to Buyer, in connection with such Loan and/or this Agreement and/or the Loan Purchase Certificate applicable to such Loan.

2.5.2      During the Diligence Period, Buyer shall not contact any Borrower or other party related to any Loan in connection with Buyer's proposed purchase of a Loan unless specifically permitted by Seller.  Before purchasing a Loan, Buyer shall contact Seller to request any document or information that Buyer believes is not contained in the Loan File and may be material to its independent evaluation of the Loan and its decision whether to purchase the Loan, and Seller shall provide such documents or information to the extent within Seller's possession or control. Seller shall notify Buyer of any material changes to the Loan or Loan File as they become available prior to or after the Closing Date.

Exhibit 1

Section 2.6    <u>Payment of Purchase Price</u>.  On or before the Closing Date applicable to the Loan in question, Buyer shall deliver to Seller the Purchase Price for such Loan, plus Buyer's share of costs and charges payable pursuant to this Agreement for such Loan.

Section 2.7    <u>Closing Deliveries</u>.

2.7.1    <u>Seller Deliveries</u>.  At least one (1) Business Day before the Closing Date for any particular Loan, Seller shall execute (and where applicable, duly acknowledge) and deliver a copy to Buyer via electronic delivery, the following documents (collectively, "<u>Seller Closing Documents</u>") in connection with the sale of such Loan, unless (and then, only to the extent) delivery of any of the below items is waived by Buyer in writing:  (i) the Note evidencing such Loan; (ii) the duly executed allonge endorsement to the Note evidencing such Loan, the form of which is attached hereto as <u>Exhibit B</u>; (iii) the Loan Documents applicable to such Loan; (iv) one (1) duly executed counterpart of the Assignment and Assumption of Loan Documents for such Loan, the form of which is attached hereto as <u>Exhibit C</u> ("<u>Assignment and Assumption of Loan Documents</u>"); (v) an Assignment of Security Instrument with respect to the Security Instrument applicable to such Loan, in substantially the form and content set forth on <u>Exhibit D</u>, attached hereto and made a part hereof, executed and acknowledged by Seller ("<u>Assignment of Security Instrument</u>"); (vi) the Seller Loan Policy for such Loan; (vii) a loan payment history for the Note; (viii) a separate letter executed by Seller and addressed to the Borrower of such Loan (1) notifying the Borrower that the Loan and all Loan Documents associated therewith have been purchased by, and assigned to, Buyer as of the Closing Date (for each Loan, a "<u>Borrower Notification Letter</u>"), a form of which is attached hereto as <u>Exhibit E</u>, which shall be (A) prepared in accordance with the Loan Documents (to the extent the Loan Documents contemplate same) and (B) otherwise reasonably acceptable to Buyer, (ix) if and to the extent any impound accounts have been established for such Loan, (A) cause all such impound accounts (and the funds therein) to be assigned to Buyer as of the Closing Date for such Loan, or (B) Buyer shall receive a credit against the Purchase Price for such Loan in an amount equal to all funds included within such impound accounts as of such Closing Date; and (x) such other documents as may be reasonably requested by Buyer to consummate the sale of such Loan to Buyer in accordance with the terms of this Agreement and the Loan Purchase Certificate for such Loan.

2.7.2    <u>Buyer Deliveries</u>.  For each Loan being purchased by Buyer, and in addition to the Purchase Price for such Loan plus Buyer's share of costs and charges payable pursuant to this Agreement for such Loan, Buyer shall deliver to Seller via electronic delivery at least one (1) Business Day before the Closing Date of such Loan the following documents (the "<u>Buyer Closing Documents</u>"):  (i) one (1) duly executed counterpart of the Assignment and Assumption of Loan Documents for such Loan; and (ii) such other documents as may be reasonably requested by Seller to consummate the sale of such Loan to Seller in accordance with the terms of this Agreement and the Loan Purchase Certificate for such Loan.

Section 2.8    <u>Disbursements and Other Actions</u>.

Exhibit 1

2.8.1        On the Closing Date for sale of the Loan in question, Seller shall promptly undertake all of the following:

(a)     cause the Borrower Notification Letter for such Loan to be delivered to the Borrower under such Loan;

(b)     deliver to Buyer the original Note evidencing such Loan, the original Loan File and the Seller's Loan Policy for such Loan; and

(c)     cause Title Company to issue to Buyer an endorsement to the Seller's Loan Policy for such Loan if needed for Buyer to be fully insured under such policy.

2.8.2        On the Closing Date for sale of the Loan in question, Buyer shall promptly undertake all of the following:

(a)     disburse the Purchase Price for such Loan to Seller, less items chargeable to the account of Seller pursuant hereto, if any; and

(b)     cause the Assignment of Security Instrument for such Loan to be recorded in the Official Records of each and every County and State in which the Property securing such Loan is located.

Section 2.9    <u>Closing Costs</u>.  Seller shall pay (a) the premiums for any title endorsements, if applicable, and (b) any broker, finder, or other person claiming by, through, or under Seller.  Buyer shall pay (a) all costs and expenses of recording and filing hereunder, (b) expenses incurred by Buyer in connection with any review, inspection, and investigation undertaken pursuant to this Agreement, and (c) any broker, finder, or other person claiming by, through, or under Buyer.  Other closing costs shall be apportioned in accordance with the custom and practice in the jurisdiction where the Property is located.  Each Party shall pay its own attorney's fees.

Section 2.10        <u>Loan Proceeds</u>.  The Parties agree that, with respect to any particular Loan, (a) all Loan payments received by Seller and applicable to the time period prior to the month in which the Closing Date for such Loan occurs, shall be retained by Seller, (b) all Loan payments received by Buyer and applicable to the time period from and after the month in which the Closing Date for such Loan occurs, shall be retained by Buyer, and (c) all Loan payments received by Buyer and/or Seller that are applicable to the month in which the Closing Date for such Loan occurs shall be prorated as of the Closing Date for such Loan, such that (i) to the extent Seller has, prior to the Closing Date for such Loan, received any Loan payment applicable to the month in which the Closing Date for such Loan occurs that is payable to Buyer pursuant to this clause (c), Buyer shall receive a credit against the Purchase Price for such Loan for the amount of same, and (ii) to the extent Buyer has, from after the Closing Date for such Loan, received any Loan payment applicable to the month in which the Closing Date for such Loan occurs that is payable to Seller pursuant to this clause (c), Buyer shall promptly remit same to Seller.  Seller shall pay all servicing fees, trustee fees and any other costs and expenses that are in the ordinary course of owning the Loan and that are due and payable by Seller, in its capacity as the lender under the Loan, to third-parties prior to the related Closing Date.  The Parties further agree that any principal

Exhibit 1

payments made on the Note for the Loan in question between the date that a Loan Purchase Certificate for such Loan is mutually executed by the Parties and the Closing Date for such Loan occurs shall be fully credited for Buyer's benefit against the Purchase Price for such Loan.  Accordingly, subject to the provisions of this Section 2.10, with respect to any particular Loan, Seller shall be entitled to, and shall be entitled to the benefit of, all payments of principal and interest, prepayment penalties or premiums, fees, reimbursements, proceeds (including, without limitation, insurance proceeds, condemnation awards, and proceeds from any Collateral for such Loan), and all other sums and amounts (collectively, for the Loan in question, the "<u>Loan Proceeds</u>") paid by Borrower, Guarantor, or any other Person with respect to such Loan and applicable to the time period preceding the Closing Date for such Loan. Except as otherwise stated in the applicable Loan Purchase Certificate, Buyer shall be entitled to all Loan Proceeds with respect to such Loan which are applicable to the time period from and after the Closing Date for such Loan, and to the extent Seller receives any such Loan Proceeds (x) after the Closing Date for such Loan, Seller shall promptly deliver same to Buyer or (y) prior to the Closing Date for such Loan, Buyer shall receive a credit against the Purchase Price for such Loan for the amount of same. In the event that, between the date the Parties mutually execute a Loan Purchase Certificate and the Closing Date for any particular Loan identified in such Loan Purchase Certificate, Seller disburses to the Borrower pursuant to and in accordance with the terms and conditions of such Loan, any portion (if any) of the "Committed and Undisbursed Amount" (as identified on <u>Schedule 1</u> attached to such Loan Purchase Certificate) of such Loan, Seller shall receive a credit as of the Closing Date for such Loan equal to the amount of such disbursement; provided, however, in no event shall that portion of the Purchase Price applicable to such Loan exceed the principal outstanding balance of such Loan as of the Closing Date therefor.  Seller shall promptly notify Buyer of any disbursements made to the Borrower, or any principal payments received from Borrower, between the date the Parties mutually execute a Loan Purchase Certificate and the Closing Date for the Loan(s) included within such Loan Purchase Certificate.  For example purposes only, if (1) Seller has made a Loan to Borrower with a $1,000,000 principal commitment, (2) as of the date the Parties mutually execute a Loan Purchase Certificate that includes such Loan, Seller has disbursed $600,000 of such principal commitment to Borrower, (3) after the date the Parties mutually executed such Loan Purchase Certificate, but prior to the Closing Date for such Loan, Seller disburses and additional $100,000 of such principal commitment to Borrower and (4) the day immediately preceding the Closing Date for such Loan, Seller receives a principal payment from Borrower in the amount of $250,000 applicable to such Loan, then the total Purchase Price payable by Buyer to Seller under this Agreement and the Loan Purchase Certificate with respect to such Loan shall be $450,000.  The obligations under this Section 2.10 shall survive the consummation of the transaction contemplated hereunder and/or under any Loan Purchase Certificate.

Section 2.11        <u>Early Payment Defaults</u>.  With respect to any Loan, if the related Borrower fails to make any of the first three (3) monthly payments due to Buyer after the related Closing Date, and such failure is not due to an administrative error by the applicable servicer, Seller shall, upon receipt of notice from Buyer, repurchase such Loan from Buyer within five (5) Business Days of such notice at the Repurchase Price.

Exhibit 1

Section 2.12          Conditions to Closing.

2.12.1          Conditions to Buyer's Obligations.  The Closing Date for any particular Loan and the obligations of Buyer to consummate the transactions contemplated by this Agreement and the Loan Purchase Certificate for such Loan are, in addition to the other terms and conditions of this Agreement and such Loan Purchase Certificate, subject to the satisfaction of the following conditions set forth in this Section 2.12.1, each of which is for the sole benefit of Buyer, and any one or more of which may be waived in whole or in part by Buyer in writing in its sole discretion:

(a)     the representations and warranties of Seller set forth in Article 4 of this Agreement shall be true on and as of the Closing Date for such Loan as if the same were made on and as of such Closing Date; and

(b)     Seller shall have fully and timely performed, in all material respects, all covenants and obligations required by this Agreement and the Loan Purchase Certificate for such Loan to be performed by Seller on or prior to the Closing Date for such Loan; and

(c)     Buyer's title to the beneficial interest under the Security Instrument for such Loan shall be evidenced by (i) an endorsement to the Seller's Loan Policy, issued by the Title Company, insuring Buyer's beneficial interest under the Security Instrument evidencing such Loan and naming Buyer as the insured party under the Seller Loan Policy for such Loan; or (ii) written evidence in the Seller's Loan Policy that the insured under such policy includes Seller's successors and assigns.

2.12.2          Conditions to Seller's Obligations.  The Closing Date for any particular Loan and the obligations of Seller to consummate the transactions contemplated by this Agreement and the Loan Purchase Certificate for such Loan are, in addition to the other terms and conditions of this Agreement and such Loan Purchase Certificate, subject to the satisfaction of the following conditions set forth in this Section 2.12.2, each of which is for the sole benefit of Seller, and any one or more of which may be waived in whole or in part by Seller in writing in its sole discretion:

(a)     Seller shall have received the Purchase Price for such Loan, and Buyer shall have paid any and all costs, fees, expenses, or pro-rations required of Buyer hereunder in connection with such Loan; and

(b)     Buyer shall have executed and deposited with Seller all of the Buyer Closing Documents applicable to such Loan.

## ARTICLE 3   - BUYER'S REPRESENTATIONS, WARRANTIES AND COVENANTS

Section 3.1     Buyer represents, warrants and covenants to Seller, as follows, as of the Effective Date and as of the Closing Date:

3.1.1          Authority.  Buyer has taken all necessary action to duly authorize its entry into and performance under this Agreement and each Loan Purchase Certificate.

Exhibit 1

Buyer is not required to obtain any consents or approvals to consummate the transactions contemplated in this Agreement and/or any Loan Purchase Certificate not otherwise already obtained. Buyer has the capacity and authority to consummate the transactions contemplated by this Agreement and each Loan Purchase Certificate. This Agreement, each Loan Purchase Certificate and all instruments, documents and agreements to be executed by Buyer in connection herewith and therewith are, or when delivered shall be, duly authorized, executed and delivered by Buyer and are, or when delivered will be, valid, binding and enforceable obligations of Buyer. Each individual executing this Agreement and/or any Loan Purchase Certificate on behalf of Buyer is duly authorized to do so.

3.1.2    No Violation.  The execution and delivery by Buyer of this Agreement and each Loan Purchase Certificate, and consummation of the transactions contemplated herein and therein, will not, with or without giving of notice or passage of time, or both: (i) conflict with or violate any law, statute, rule, regulation, or administrative order to which Buyer is subject or by which Buyer's assets are bound or affected; (ii) violate any judgment, order, writ, or decree of any court or administrative body in any suit or proceeding to which Buyer is a party; (iii) result in a breach of, or default under, any material agreement, commitment, contract (written or oral), or other material instrument, to which Buyer is a party or by which any of Buyer's assets are bound or affected; or (iv) render Buyer insolvent or without sufficient working capital.

3.1.3    Binding Agreement.  Buyer has the requisite legal capacity to enter into and consummate the transactions contemplated by this Agreement and each Loan Purchase Certificate, and this Agreement and each Loan Purchase Certificate constitutes a valid and binding obligation of Buyer to Seller enforceable in accordance with its terms.

3.1.4    Good Standing.  Buyer has been duly-formed, is validly-existing, and in good standing in the state in which it was organized.

3.1.5    No Actions Against Buyer.  There are no actions, suits, claims, proceedings, or investigations, pending or threatened against Buyer which might impair the consummation of the terms and conditions of this Agreement and/or any Loan Purchase Certificate.

Section 3.2    Survival. Buyer's representations and warranties in this Article 3 shall survive each Closing until the Loans are repaid in full.

## ARTICLE 4   - SELLER'S REPRESENTATIONS AND WARRANTIES

Section 4.1    Seller represents, warrants and covenants to Buyer, as follows, as of the Effective Date:

4.1.1    Authority.  Seller has taken all necessary action to duly authorize its entry into and performance under this Agreement and each Loan Purchase Certificate. Seller is not required to obtain any licenses, consents or approvals to consummate the transactions contemplated in this Agreement and/or any Loan Purchase Certificate not otherwise already obtained. Seller has the capacity and authority to consummate the

Exhibit 1

transactions contemplated by this Agreement and each Loan Purchase Certificate. This Agreement, each Loan Purchase Certificate and all instruments, documents and agreements to be executed by Seller in connection herewith and therewith are, or when delivered shall be, duly authorized, executed and delivered by Seller and are, or when delivered will be, valid, binding and enforceable obligations of Seller.  Each individual executing this Agreement and/or any Loan Purchase Certificate on behalf of Seller is duly authorized to do so.

4.1.2      No Violation.  The execution and delivery by Seller of this Agreement and each Loan Purchase Certificate, and consummation of the transactions contemplated herein and therein, will not, with or without giving of notice or passage of time, or both: (i) conflict with or violate any law, statute, rule, regulation, or administrative order to which Seller is subject or by which Seller's assets are bound or affected; (ii) conflict with Seller's articles of incorporation or by-laws, (iii) violate any judgment, order, writ, or decree of any court or administrative body in any suit or proceeding to which Buyer is a party; (iv) result in a breach of, or default under, any material agreement, commitment, contract (written or oral), or other material instrument, to which Seller is a party or by which any of Seller's assets are bound or affected; or (v) render Seller insolvent or without sufficient working capital.

4.1.3      Binding Agreement.  Seller has the requisite legal capacity to enter into and consummate the transactions contemplated by this Agreement and each Loan Purchase Certificate, and this Agreement and each Loan Purchase Certificate constitutes a valid and binding obligation of Seller to Buyer enforceable in accordance with its terms.

4.1.4      Good Standing.  Seller is duly organized, validly existing, and in good standing under the laws of the state in which it was formed.

4.1.5      No Action Against Seller.  There is no action, suit, or regulatory or other proceeding of any kind pending or, to Seller's knowledge, threatened against Seller which, if determined adversely to Seller, would have a material adverse effect on Seller's ability to perform its obligations as Seller hereunder.

4.1.6      No Adverse Selection.  Seller used no selection procedures that identified Loans offered for sale to Buyer hereunder as being less desirable or valuable than other comparable Loans owned by Seller.  Seller shall not offer any Loans to Buyer hereunder that have already been offered to and rejected by another party.

4.1.7      No Broker.  Seller has not dealt with any broker, investment banker, agent, or other person, except for Buyer, who may be entitled to any commission or compensation in connection with the sale of Loans pursuant to this Agreement; provided, that if Seller has dealt with any broker, investment banker, agent, or other person, except for Buyer, who may be entitled to any commission or compensation in connection with the sale of Loans pursuant to this Agreement, such commission or compensation shall have been paid in full by Seller.

Exhibit 1

Section 4.2    Seller shall be deemed to have made the following additional representations, warranties and covenants to Buyer, with respect to each Loan in question, each of which representations, warranties and covenants Seller represents to be true and correct in all material respects as of the execution of the Loan Purchase Certificate for the Loan in question and as of the Closing Date for such Loan, unless otherwise expressly stated in Schedule 2 to the Loan Purchase Certificate for the Loan in question:

4.2.1    Ownership.  Seller is the owner of the Loan and holder of the Loan Documents, and Seller has the full right to transfer and sell the Loan to Buyer free and clear of any encumbrance, equity, lien, pledge, charge, claim or security interest, and following the sale of each Loan, Buyer will own the Loan and hold the Loan Documents free and clear of any encumbrance, equity, participation interest, lien, pledge, charge, claim or security interest.

4.2.2    Loan Balance; Disbursement of Proceeds.  The outstanding principal balance of the Note for the Loan in question, as well as the amount which remains committed but undisbursed, is accurately set forth on Schedule 1 attached to the Loan Purchase Certificate for the Loan in question.  All costs, fees and expenses incurred in making or closing the Loan and all recording fees and costs were paid, and the Borrower is not entitled to any refund of any amounts paid or due under the Loan Documents.

4.2.3    Impound Accounts.  There are no impound accounts for taxes, insurance or any other items associated with the Loan in question except as may be shown on Schedule 1 attached to the Loan Purchase Certificate for such Loan.

4.2.4    No Foreclosure Actions.  Seller has not commenced any judicial or non-judicial foreclosure actions or exercised any other enforcement actions in connection with the Loan, including without limitation, any equitable rights of set-off.

4.2.5    No Litigation.  Seller has not received notice of any pending or threatened litigation, administrative proceeding, investigation, executive or legislative proceeding or other form of governmental enforcement in any way related to, directed at or otherwise affecting (i) the Loan Documents or (ii) the use, operation or occupancy of any portion of the Property securing the Loan or other Collateral referenced in the Security Instrument for such Loan, or (iii) any affirmative defenses of Borrower or Guarantor to the Loan.

4.2.6    Loan Payments.  All payments required to be made under the terms of the Loan Documents have been made and credited up to the Closing Date for the Loan.  No Loan has been more than 30 days delinquent, without giving effect to any grace or cure period, in making required payments since origination, and as of the Closing Date, no Loan is more than 30 days delinquent (beyond any applicable grace or cure period) in making required payments.  There is (a) no material default, breach, violation or event of acceleration existing under any Loan, and (b) no event (other than payments due but not yet delinquent) which, with the passage of time or with notice and the expiration of any grace or cure period, would constitute a material default,

Exhibit 1

breach, violation or event of acceleration, which default, breach, violation or event of acceleration, in the case of either clause (a) or clause (b), materially and adversely affects the value of the Loan or the value, use or operation of the related Property. Seller has not waived any default, breach, violation or event of acceleration under the Loan or any Loan Document.

4.2.7    <u>Accuracy of Loan Documents</u>.  The Loan Documents delivered to Buyer hereunder are true and correct and the terms of the Loan Documents have not been impaired, waived, altered or modified in any respect, except by written instruments which have been recorded to the extent any such recordation is required by law, or, necessary to protect the interest of the Buyer.  The terms of any such waiver, alteration or modification (whether complete or in process) are reflected in the Loan Documents, and the written instrument reflecting such terms has been included in the Loan File for the Loan.  No Borrower has been released, in whole or in part, from the terms of the Loan Documents.

4.2.8    <u>No Violation Loan Documents - Advertising</u>.  The posting and advertising of information by Buyer relating to the Loan, the Property securing the Loan, the Borrower(s) and/or Guarantor(s) under the Loan at any time prior or after the Closing Date for the Loan will not violate the terms of any agreements to which Seller is a party.

4.2.9    <u>Taxes Paid</u>.  To Seller's knowledge, all taxes, governmental assessments, insurance premiums, water, sewer and municipal charges, leasehold payments or ground rents and any other charges payable on the Loan which previously became due and owing are non-delinquent, have not become a lien upon the Property securing the Loan and have been paid, or escrow funds have been established, to the extent permitted by law, in an amount sufficient to pay for every such escrowed item which remains unpaid and which has been assessed but is not yet due and payable.

4.2.10    <u>No Defenses</u>.  The Loan is not subject to any right of rescission, set-off, counterclaim or defense, including, without limitation, the defense of usury and no such right of rescission, set-off, counterclaim or defense has been asserted in writing with respect thereto. Seller has no knowledge nor has it received any notice that any Borrower in respect of the Loan is presently, or was at the time the Loan was originated, a debtor in any state or Federal bankruptcy or insolvency proceeding. Seller has not, nor, to Seller's knowledge, has any originator from which Seller acquired the Loan advanced funds, or induced, solicited, or knowingly received any advance of funds by a party other than the Borrower, directly or indirectly, for the payment of any amount required under the Loan.

4.2.11    <u>Hazard Insurance</u>.  The Property securing the Loan is insured by a fire and extended perils insurance policy, issued by a generally acceptable insurance carrier, and such other hazards as are customary in the area where such Property is located, and to the extent required by Seller as of the date on which the Loan was originated, and against other risks insured against by Persons operating like properties in the locality of such Property, in an amount not less than the greatest of (a) one hundred percent (100%) of the replacement cost of all improvements to such Property,

Exhibit 1

or (b) the outstanding principal balance of the Loan, all in a form usual and customary in the industry and that is in full force and effect, and all amounts required to have been paid under any such policy have been paid.  If any portion of such Property is in an area identified by any Federal governmental authority as having special flood hazards, and flood insurance is available, a flood insurance policy meeting the current guidelines of the Federal Emergency Management Agency is in effect with a generally acceptable insurance carrier, in an amount representing coverage not less than the least of (a) the outstanding principal balance of the Loan, (b) the full insurable value of the Property, and (c) the maximum amount of insurance available under the National Flood Insurance Act of 1968, as amended by the Flood Disaster Protection Act of 1974.  All such insurance policies (collectively, the "Hazard Insurance Policy") contain a standard mortgagee clause naming Seller, its successors and assigns (including, without limitation, subsequent owners of the Loan), as mortgagee.  Seller has not engaged in, and has no knowledge of the Borrower's having engaged in, any act or omission which would impair the coverage of any such policy, the benefits of the endorsement provided for herein, or the validity and binding effect of either including, without limitation, no unlawful fee, commission, kickback or other unlawful compensation or value of any kind has been or will be received, retained or realized by any attorney, firm or other Person, and no such unlawful items have been received, retained or realized by Seller.  Seller has caused or will cause to be performed any and all acts required to preserve the rights and remedies of Buyer in any insurance policies applicable to the Loan including, without limitation, any necessary notifications of insurers, assignments of policies or interests therein, and establishments of coinsured, joint loss payee and mortgagee rights in favor of Buyer.

4.2.12     Compliance with Applicable Laws.  (a) Any and all requirements of any federal, state or local law including, without limitation, usury, truth-in-lending, real estate settlement procedures, consumer credit protection, equal credit opportunity or disclosure laws applicable to the Loan have been complied with, and (b) the consummation of the transactions contemplated hereby will not involve the violation by Seller of any such laws or regulations, and Seller shall maintain or shall cause its agent to maintain in its possession, available for the inspection of Buyer, and shall deliver to Buyer, upon demand, evidence of compliance with all such requirements.

4.2.13     No Waivers.  The Security Instrument securing the Loan has not been satisfied, canceled, subordinated or rescinded, in whole or in part, and the Property has not been released from the lien of the Security Instrument, in whole or in part, nor has any instrument been executed that would affect any such release, cancellation, subordination or rescission.  Seller has not waived the performance by the Borrower of any action, if the Borrower's failure to perform such action would cause the Loan to be in default, nor has Seller waived any default resulting from any action or inaction by the Borrower.

4.2.14     Location and Type of Property.  The Property is located in the United States or a territory of the United States.  The Property consists of a single parcel of real Property with a detached single-family residence erected thereon, or a two- to four-family dwelling.  No portion of the Property shall be used (a) for commercial purposes (other than the general rehabilitation of the Property by the Borrower in the

Exhibit 1

ordinary course of the Borrower's business), (b) as the Borrower's primary residence or in any other manner that would cause the Property to be considered an owner-occupied Property or (c) for any other personal or household purposes. Borrower does not intend to occupy the Property for more than fourteen (14) calendar days during any one (1) calendar year.

4.2.15    <u>Validity of Loan Documents</u>. All parties to the Loan Documents had legal capacity to enter into the Loan and to execute and deliver the Loan Documents, and the Loan Documents have been duly and properly executed by such related parties. No fraud, error, omission, misrepresentation, negligence or similar occurrence with respect to the Loan has taken place on the part of Seller, and to Seller's knowledge on the part of any Person, including, without limitation, the Borrower, any appraiser, any builder or developer, or any other party involved in the origination of the Loan.

4.2.16    <u>Accuracy of Information</u>.  To the best of the Seller's knowledge, all information supplied by, on behalf of, or concerning the Borrower is true, accurate and complete and does not contain any statement that is or will be inaccurate or misleading in any material respect.

4.2.17    <u>Title Insurance</u>. Where required by state law or regulation, the Borrower was given the opportunity to choose the carrier of the Seller's Loan Policy. Seller's Loan Policy is valid and remains in full force and effect.  No claims have been made under such Seller's Loan Policy, and no prior holder or servicer of the Loan, including Seller, has done, by act or omission, anything which would impair the coverage of such Seller's Loan Policy.

4.2.18    <u>No Mechanic's Liens</u>.  There are no mechanics' or materialmen's or similar liens or claims which have been filed for work, labor or material (and no rights are outstanding that under law could give rise to such liens) affecting the Property which are or may be liens prior to or equal to or coordinate with, the lien of the Loan.

4.2.19    <u>Payment Terms</u>.  Principal, to the extent applicable under the Loan, and interest payments on the Loan commenced no more than sixty (60) days after funds were disbursed in connection with the Loan.  Interest on the Loan is payable on the first day of each month, with interest calculated and payable in arrears.  Principal on the Loan is payable on the earlier of the maturity date of the Loan and the date on which the indebtedness thereunder becomes immediately due and payable thereunder. The Loan Documents do not permit negative amortization.

4.2.20    <u>Occupancy</u>.  To Seller's knowledge, all inspections, licenses, and certificates required to be made or issued with respect to all occupied portions of the Property and, with respect to the use and occupancy of the same, including but not limited to certificates of occupancy and fire underwriting certificates, are, or will be, obtained from the appropriate authorities at the time required in the jurisdiction such Property resides.  Seller has not received notification from any governmental authority that the Property is in material non-compliance with such laws or regulations, is being used, operated or occupied unlawfully or has failed to have or obtain such inspection,

Exhibit 1

licenses or certificates, as the case may be.  Seller has not received notice of any violation or failure to conform with any such law, ordinance, regulation, standard, license or certificate.

4.2.21     No Other Collateral.  The Loan is not and has not been secured by any collateral except the lien of the corresponding Security Instrument and the security interest of any applicable security agreement or chattel mortgage and such collateral does not serve as security for any other obligation.

4.2.22     Security Instrument.  If applicable, a trustee, authorized and duly qualified if required under applicable law to act as such, has been properly designated and currently so serves and is named in the Security Instrument, and no fees or expenses are or will become payable by the Buyer to the trustee under the Security Instrument, except in connection with a trustee's sale or attempted sale after default by the Borrower.

4.2.23     Recordable.  The Security Instrument was recorded, or is in the process of being recorded, and all subsequent assignments of the original Security Instrument, showing a complete chain of title from the originator to the Seller, as applicable, have been recorded or are in the process of being recorded in the appropriate jurisdictions in which such recordation is necessary to perfect the liens against creditors of the Seller.

4.2.24     No Damage/Condemnation.  The Property is not subject to any material damage adversely affecting the value of the Property or the use for which the premises were intended or rendering the Property uninhabitable, and the Property is in substantially the same condition it was at the time the most recent appraised value was obtained.  There is no proceeding pending or threatened for the total or partial condemnation of the Property.  There have not been any condemnation proceedings with respect to the Property and there are no such proceedings scheduled to commence at a future date.

4.2.25     Collection Practices; Escrow Deposits.  The origination and collection practices used by the originator, each servicer of the Loan and Seller with respect to the Loan have been in all respects in compliance with Accepted Servicing Practices and have been in all respects legal and proper.  All escrow payments have been collected in full compliance with state and federal law.  No escrow deposits or escrow payments or other charges or payments due Seller have been capitalized under any Loan Document.  Any interest required to be paid pursuant to state, federal and local law has been properly paid and credited.

4.2.26     Service Members Civil Relief Act.  The Borrower has not notified Seller, and Seller has no knowledge, of any relief requested or allowed to the Borrower under the Service Members Civil Relief Act of 2003.

4.2.27     Valuation.  Each Loan File contains a written Appraisal or BPO with respect to the related Property prepared by a Qualified Appraiser. The person performing any property valuation received no benefit from, and such person's compensation or flow of business from the originator was not affected by, the

Exhibit 1

approval or disapproval of the Loan.  The selection of the person performing the property valuation was made independently of the broker (where applicable) and the originator's loan sales and loan production personnel.

4.2.28     <u>Fair Lending</u>.  No predatory, abusive or deceptive lending practices, including but not limited to, the extension of credit to a Borrower without regard for the Borrower's ability to repay the Loan and the extension of credit to a Borrower which has no tangible net benefit to the Borrower, were employed in connection with the origination of the Loan.

4.2.29     <u>Disclosure Materials</u>.   The Borrower has received all disclosure materials required by applicable law in connection with the origination of the Loan.

4.2.30     <u>No Equity</u>.   No document relating to the Loan provides for any contingent or additional interest in the form of participation in the cash flow of the Property or a sharing in the appreciation of the value of the Property.   The indebtedness evidenced by the Loan Documents is not convertible to an ownership interest in the Property or the Borrower and Seller has not financed nor does it own directly or indirectly, any equity of any form in the Property or the Borrower.

4.2.31     <u>Documents Genuine</u>.  All documents contained in the Loan File are complete and authentic and all signatures thereon are genuine.

4.2.32     <u>Single Original Note</u>.  There is only one originally executed promissory Note not stamped as a duplicate with respect to the Loan.

4.2.33     <u>Environmental Matters</u>.  To Seller's knowledge, the Property is free from any and all toxic or hazardous substances in violation of any local, state or federal environmental law, and there exists no violation of any local, state or federal environmental law, rule or regulation.  To Seller's knowledge, there is no pending action or proceeding directly involving the Property in which compliance with any environmental law, rule or regulation is alleged to have been violated.

4.2.34     <u>No Holdbacks</u>.  Except with respect to any Loan identified on the Loan Purchase Certificate as being subject to Holdback Funds, the stated principal balance of each Loan has been fully disbursed as of the Closing Date and there is no requirement for future advances thereunder except where (a) the full amount of the Loan has been disbursed but a portion thereof is being held in escrow or reserve accounts or (b) future advances are required, in each case, pending the satisfaction of certain conditions relating to leasing, repairs, property improvement or other matters with respect to the related Property, the Borrower or other considerations determined by Seller to merit such holdback.

4.2.35     <u>Illegal Activity</u>.  To Seller's knowledge, no portion of the Property is or will be purchased with proceeds of any illegal activity and there are no illegal activities or activities relating to any controlled substances at the Property.

4.2.36     <u>Anti-Money Laundering</u>.  Seller has complied with all applicable anti-money laundering laws and regulations, including without limitation the USA Patriot

Exhibit 1

Act of 2001 (collectively, the "Anti-Money Laundering Laws"); to the extent required by law, Seller has conducted the requisite due diligence in connection with the Loan for purposes of the applicable Anti-Money Laundering Laws, including with respect to the legitimacy of the applicable Borrower and the origin of the assets used by said Borrower to purchase the Property in question, and maintains, and will maintain, sufficient information to identify the applicable Borrower for purposes of the Anti-Money Laundering Laws.

Section 4.3    Change in Circumstances.  As respects any representation that was true as of the Effective Date but thereafter becomes untrue due to facts or circumstances that are outside of Seller's control and either occur following the Effective Date and prior to the Closing Date for the Loan in question, or are first discovered by Seller following the Effective Date and prior to such Closing Date, the following shall apply: (a) Seller shall promptly notify Buyer in writing of such untrue matters (describing with particularity the nature of the untrue matters in question); and (b) notwithstanding anything contained herein to the contrary, (i) Seller shall not be deemed to be in default under this Agreement with respect to any untrue matters contained in such representation or warranty, so long as Seller notifies Buyer of such untrue matter in writing at least three (3) Business Days prior to the Closing Date for such Loan (and the Closing Date for such Loan shall be extended as may be necessary to allow Buyer to evaluate the untrue matters in question during such three (3) Business Day period), and (ii) Seller shall have no liability to Buyer with respect to such matters if Seller timely notifies Buyer, pursuant to clause (i) above, of the untrue matters in question and Buyer nevertheless proceeds to Closing despite Buyer's knowledge that such representation or warranty is untrue (and in such event, Buyer's purchase of such Loan shall be subject to such matters and (iii) Buyer shall have no obligation to purchase such Loan.

Section 4.4    Survival. Seller's representations and warranties in this Article 4 shall survive each Closing until the Loans are repaid in full.

## ARTICLE 5  – SERVICING

Section 5.1    Servicing of Loans Prior to Closing.  Up to and including the related Closing Date, Seller shall have the sole and exclusive right, power, and authority to service such Loan and deal with the Borrower and Guarantor under such Loan in all matters pertaining to such Loan and the Loan Documents applicable thereto; provided, however, Seller shall not amend or otherwise modify any of the Loan Documents for such Loan from and after the date the Parties mutually execute a Loan Purchase Certificate for such Loan without the express written consent of Buyer, which consent shall not be unreasonably withheld.  Seller may, but shall have no duty to, take any action to enforce any right or obligation of Borrower, Guarantor, or any other obligor under the Loan Documents for such Loan, and/or to liquidate or pursue any recovery from any security for such Loan; provided, however, notwithstanding anything to the contrary contained herein, from and after the expiration of the Diligence Period for such Loan, Seller shall not take any action to enforce any right or obligation of Borrower, Guarantor, or any other obligor under the Loan Documents for such Loan, and/or liquidate or pursue any recovery from any security for such Loan without the

Exhibit 1

express written consent of Buyer, which consent shall not be unreasonably withheld. Seller shall inform Buyer in writing of any change in the Borrower and/or Guarantor under each Loan identified in the Loan Purchase Certificates and deliver to Buyer copies of all written notices, billings and/or other communications to Borrower and/or Guarantor under such Loans, including without limitation, any notices, billings and/or other communications with respect to (i) Borrower's and/or Guarantor's performance (or ability to perform) under the Loan Documents for such Loan, and/or (ii) Borrower's and/or Guarantor's management, composition, organization, financial condition and/or any disability of Borrower and/or Guarantor or any of their respective partners or affiliates, including any written enforcement or default notices delivered to Borrower and/or Guarantor from and after the date the Parties mutually execute a Loan Purchase Certificate that includes such Loan.

Section 5.2    <u>Servicing of Loans After Closing</u>.  Following the related Closing Date, Buyer shall have the sole and exclusive right, power and authority to service such Loan or cause such Loan to be serviced, including, without limitation, the right to assign the servicing rights to another party and to deal with the Borrower and Guarantor under such Loan in all matters pertaining to such Loan and the Loan Documents applicable thereto.

## ARTICLE 6    - REMEDIES

Section 6.1    <u>Repurchase.</u>

6.1.1        Upon discovery by either Seller or Buyer of a breach of any representation or warranty contained in Article 4 that materially and adversely affects the value of the applicable Loans and/or the interests of Buyer in such Loans (a "<u>Breach</u>"), the Party discovering such Breach shall give prompt written notice to the other Party.

6.1.2        Seller shall have ten (10) days to cure any Breach, or such longer period as the Buyer reasonably determines is necessary given the nature of such Breach (the "<u>Cure Period</u>") prior to being required to repurchase the affected Loans. The Cure Period shall commence upon either Party's written notice to the other party of the related Breach, supported by commercially reasonable documentation supporting such alleged Breach.  If a Breach is not cured within such Cure Period, then at Buyer's option, the affected Loan shall be repurchased by Seller within five (5) Business Days of the expiration of such Cure Period at the Repurchase Price.

6.1.3        Upon completion of such repurchase by Seller, Buyer and Seller shall arrange for the reassignment of the repurchased Loan to Seller and the delivery to Seller of any documents held by Buyer or its custodian relating to the repurchased Loan.  In the case of any lien for which an assignment from Seller to Buyer has been recorded prior to repurchase, Buyer shall concurrently with the repurchase provide an executed assignment from Buyer to Seller.  Seller shall pay any necessary recording costs in connection with recording such reassignment.

Exhibit 1

Section 6.2    <u>Buyer Default</u>. Buyer and Seller hereby acknowledge and agree that in the event of a default or breach by Buyer in the performance of Buyer's obligations or covenants under this Agreement and/or under any Loan Purchase Certificate, or the breach by Buyer of any of Buyer's representations or warranties under this Agreement, a "<u>Buyer Default</u>" under this Agreement shall have been deemed to have occurred.  In the event of a Buyer Default concerning a particular Loan, where such Buyer Default occurs prior to the Closing Date for such Loan, Seller's sole and exclusive remedy shall be to either (a) waive such Buyer Default and proceed to the Closing for the sale of such Loan pursuant to the terms of this Agreement and the Loan Purchase Certificate applicable to such Loan, or (b) cancel this Agreement by written notice to Buyer.  In the event of a Buyer Default concerning a particular Loan, where such Buyer Default occurs after Buyer has acquired such Loan, Seller shall be entitled to all rights and remedies available hereunder, at law and/or in equity as a result of such Buyer Default with respect to such Loan.

Section 6.3    <u>Seller Default</u>. Buyer and Seller hereby acknowledge and agree that in the event of a default or breach by Seller in the performance of Seller's obligations or covenants under this Agreement and/or under any Loan Purchase Certificate, or the breach by Seller of any of Seller's representations or warranties under this Agreement, a "<u>Seller Default</u>" under this Agreement shall have been deemed to have occurred.  In the event of a Seller Default concerning a particular Loan, where such Seller Default occurs prior to the Closing Date for such Loan, Buyer's sole and exclusive remedy shall be to either (a) waive such Seller Default and proceed to the Closing for the sale of such Loan pursuant to the terms of this Agreement, or (b) cancel this Agreement by written notice to Seller.  In the event of a Seller Default concerning a particular Loan, where such Seller Default occurs after Buyer has acquired such Loan, Buyer shall be entitled to all rights and remedies available hereunder, at law and/or in equity as a result of such Seller Default with respect to such Loan.

Section 6.4    <u>Limitation of Remedies</u>.  Notwithstanding any provision to the contrary contained in this Agreement, in no event shall Seller or Buyer be liable to the other or to any other party for any punitive, speculative, special, or consequential damages.  The provisions of this Article 6 shall survive each Closing and the consummation of the transactions hereunder and under each Loan Purchase Certificate.

**ARTICLE 7   - AS-IS SALE; RELEASE; INDEMNIFICATION**

Section 7.1    <u>As-Is Sale</u>.  Subject to the terms and conditions of this Agreement (including without limitation, Seller's indemnity obligations set forth in Section 7.3 below, the Retained Claims and Seller's express representations and warranties contained in this Agreement), Seller agrees to sell, transfer and assign, and Buyer agrees to purchase and assume on the Closing Date applicable to the Loan in question, each of the Loans identified in those Loan Purchase Certificates, if any, that are mutually executed by the Parties, if at all, on an "AS IS," "WHERE IS" BASIS, "WITH ALL FAULTS" AND WITHOUT REPRESENTATIONS, EXPRESS OR IMPLIED, OF ANY TYPE, KIND, CHARACTER OR NATURE (INCLUDING, WITHOUT LIMITATION, MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE), AND WITHOUT WARRANTIES, EXPRESS OR IMPLIED, OF ANY TYPE, KIND,

Exhibit 1

CHARACTER OR NATURE (INCLUDING, WITHOUT LIMITATION, MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE), EXCEPT THE LIMITED AND EXPRESS REPRESENTATIONS, WARRANTIES AND COVENANTS OF SELLER SET FORTH IN ARTICLE 4 HEREOF, AND WITHOUT RECOURSE OF ANY NATURE TO SELLER (EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT).

Section 7.2   <u>Release</u>.  Other than with respect to the Retained Claims, Buyer hereby releases and forever discharges Seller and Seller's directors, officers, employees, servicers, successors, assigns and affiliates (all such persons being collectively referred to as the "<u>Seller Related Persons</u>"), of and from any and all causes of action, claims, demands and remedies of whatsoever kind and nature (collectively, "<u>Claims</u>") that Buyer has or may in the future have against Seller or any Seller Related Persons, to the extent such Claims in any manner are on account of, arise out of or relate to the Loans purchased by Buyer and the rights assigned hereunder (the "<u>Released Matters</u>").  In no event, however, shall the Released Matters include, and Buyer does not release or discharge Seller or any Seller Related Persons from, any Liabilities and/or Claims to the extent same are on account of, arising out of, relating to, or by reason of Seller's breach of this Agreement and/or any Loan Purchase Certificate (including without limitation, Seller's breach of any representations, warranties and/or covenants contained herein) or Seller's indemnity obligations set forth in Section 7.3 below (collectively, the "<u>Retained Claims</u>").  It is the intention of Buyer that, subject to the Retained Claims, the foregoing general release shall be effective as a bar to all actions, causes of action, suits, claims or demands of every kind, nature or character whatsoever, known or unknown, suspected or unsuspected, fixed or contingent, arising out of or in connection with the Released Matters.

Section 7.3   <u>Indemnification</u>.  Each Party shall indemnify, defend and hold the other Party (and, such other Party's "Related Persons") harmless from and against any and all losses, liabilities, costs, expenses and damages (individually, a "<u>Liability</u>," and collectively, "<u>Liabilities</u>") sustained due to the indemnifying Party's failure to comply with such applicable laws and regulations.  Upon request, each Party shall provide evidence reasonably satisfactory to the requesting Party of such compliance.  Buyer will indemnify, defend and hold Seller and the Seller Related Persons harmless from Liabilities incurred by Seller and the Seller Related Persons, and Claims made by Crowd Investors, to the extent arising from Buyer's activities related to advertising of Loans and taking investment in said Loans (or in other products or derivatives related to said Loans) via Buyer's Platform.  Seller will indemnify, defend and hold harmless Buyer and Buyer's present and former agents, servants, directors, officers, employees, servicers, attorneys, successors, assigns and affiliates (all such persons being collectively referred to as the "<u>Buyer Related Persons</u>") from Liabilities incurred by Buyer and the Buyer Related Persons and Claims arising or resulting from or in connection with, Seller's brokering, lending, originating and/or servicing activities in connection with the Loans and/or Seller's action or failure to act or any breach of any warranty, representation or covenant contained in or made pursuant to this Agreement.  Buyer's and Seller's indemnities set forth in this Section 7.3 shall survive the Closing.  Notwithstanding anything to the contrary in this Agreement or in any Loan Purchase Certificate, Seller shall continue to be entitled (on a non-exclusive basis) to the rights

Exhibit 1

of indemnity, defense and to be held harmless provided to the lender under the Loan Documents for the Loan in question; provided, however, that (i) nothing herein shall be construed to limit the right, title and interest of Buyer once Buyer has acquired such Loans and thereby becomes the lender under such Loan Documents, to all such rights of indemnity, defense and to be held Seller's harmless, (ii) if and to the extent Seller's rights of indemnity, defense and to be held harmless provided to the lender under such Loan Documents conflict or compete in any way with Buyer's rights of indemnity, defense and to be held harmless provided to the lender under such Loan Documents, Buyer's rights shall have priority, and (iii) if and to the extent any amounts are recoverable from or payable by a Borrower and/or any Guarantor in satisfaction of such indemnity and/or defense obligations, then as between Buyer (and Buyer's Related Persons) and Seller (and Seller's Related Persons), Buyer (and Buyer's Related Persons) shall have first priority as to same.

## ARTICLE 8   - MISCELLANEOUS

Section 8.1    <u>Compliance with Laws & Regulations.</u>  Each of Buyer and Seller shall comply at all times with all laws and regulations applicable to their respective activities related to the making of, purchase and sale or re-sale of Loans and performance of its obligations hereunder and under each Loan Purchase Certificate.  Seller acknowledges that Buyer will advertise and solicit investments in Loans.  Buyer shall be solely responsible for complying with securities laws relating to the solicitation of investment and sale of securities to Crowd Investors.

Section 8.2    <u>Equal Employment Opportunity</u>. During the performance of this Agreement, Seller agrees as follows:

8.2.1        Seller shall not discriminate against any employee or applicant for employment because of race, color, religion, sex, national origin or mental or physical disability. Seller shall ensure that applicants are employed and that employees are treated during employment without regard to their race, color, religion, sex, national origin, or mental or physical disability. Such actions shall include, but not be limited to the following: employment upgrading, demotion or transfer, recruitment or recruitment advertising, layoff or termination, rates of pay or other forms of compensation and selection for training, including apprenticeship.

8.2.2        Seller shall, in all solicitations and advertisements for employees placed by, or on behalf of Servicer, state that all qualified applicants will receive consideration for employment without regard to their race, color, religion, sex, national origin, or mental or physical disability.

Section 8.3    <u>Notices</u>.  All demands, notices and communications under this Agreement shall be in writing and shall be deemed to have been duly given if (i) mailed by registered or certified mail, return receipt requested or by overnight delivery service, addressed to the appropriate Party hereto at the addresses set forth below or (ii) transmitted by electronic mail with acknowledgment, to the appropriate Party hereto at the address provided by the other Party to this Agreement.

Exhibit 1

If to Buyer:
PS Funding, Inc.
300 Manhattan Beach Blvd., Suite #205
Manhattan Beach, California 90266
Attn: Legal Department
Email: legal@peerstreet.com

If to Seller:
ICG10 Capital, LLC
18851 NE 29th Avenue, Suite 1000
Aventura, FL 33180
Attn: Warren Ifergane
Email: warren@icg10.com

Any such demand, notice or communication shall be deemed to have been received on the date delivered to or received at the premises of the addressee (as evidenced by the date noted on the return receipt or overnight delivery receipt or other evidence of receipt).   Seller covenants that it shall not, and it shall cause Servicer to not, disseminate Buyer's notice information to any third party without the prior consent of Buyer.   No notice of termination shall impair the rights or priorities of any party created or acquired prior to the receipt of such notice.  Either Party may change its address for purposes of this Section upon delivery to the other Party of a notice of a change of address in the manner provided for notices hereunder.

Section 8.4    Attorneys' Fees.   The prevailing party in any action or proceeding to interpret or enforce this Agreement and/or any Loan Purchase Certificate, or the terms of either, shall be entitled, in addition to any judgment or award upon such action or proceeding, to an award for all costs and expenses (including costs of all legal or administrative proceedings or hearings and attorneys' fees) incurred by such prevailing party or parties, including, without limitation, all attorneys' fees and related costs of enforcement of any such judgment or award and upon any appeal relating thereto.

Section 8.5    Authority.   With the intent to be legally bound, each of the undersigned hereby covenants and acknowledges that he, she, or it (a) has read each of the terms set forth herein, (b) has the authority to execute this Agreement for such person or entity, and (c) expressly consents and agrees that the person or entity upon behalf of which the undersigned is acting, shall be bound by all terms and conditions contained herein.

Section 8.6    Successors and Assigns.   The provisions of this Agreement shall be binding upon and inure to the benefit of, each of the Parties hereto, and their respective successors in interest, assigns, heirs, and personal representatives.   This Agreement may not be assigned by either Party without the prior written consent of the other Party, which consent may be granted or withheld in such other Party's sole and absolute discretion; provided, however, that Buyer shall have the right to assign this Agreement without Seller's consent to any entity controlled by, controlling or under common control with Buyer.

Exhibit 1

Section 8.7     Severability.  If any provision of this Agreement and/or any Loan Purchase Certificate shall be determined to be invalid, illegal, or unenforceable, the balance of this Agreement and such Loan Purchase Certificate shall remain in full force and effect, and if any provision is inapplicable to any person of circumstance, it shall nevertheless remain applicable to all other Persons and circumstances.

Section 8.8     Headings; Exhibits; Loan Purchase Certificate.  The article, section and paragraph headings set forth in this Agreement are inserted solely for the convenience of reference and are not a part of, and are not intended to govern, limit, or aid in the construction or interpretation of, any term or provision hereof.  The exhibits to this Agreement are hereby incorporated and made a part hereof and are an integral part of this Agreement.  The terms and conditions set forth in the related Loan Purchase Certificate between the Buyer and the Seller with respect to each Closing Date shall be incorporated herein.  With respect to the sale and purchase of the Loan or pool of Loans on each Closing Date, in the event of any conflict between the terms of this Agreement and the related Loan Purchase Certificate, the related Loan Purchase Certificate shall control with respect to such Loan or pool of Loans.

Section 8.9     Time.  Time is, and shall be, of the essence of each and every provision of this Agreement.

Section 8.10     Governing Law; Jurisdiction; Waiver of Jury Trial.  THIS AGREEMENT SHALL BE DEEMED TO HAVE BEEN MADE IN THE STATE OF CALIFORNIA. THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF CALIFORNIA, WITHOUT REFERENCE TO ITS CONFLICT OF LAW PROVISIONS, AND THE OBLIGATIONS, RIGHTS AND REMEDIES OF THE PARTIES HEREUNDER SHALL BE DETERMINED IN ACCORDANCE WITH SUCH LAWS.  BUYER AND SELLER IRREVOCABLY (I) SUBMIT TO THE EXCLUSIVE JURISDICTION OF THE COURTS OF THE STATE OF CALIFORNIA FOR THE PURPOSE OF ANY ACTION OR PROCEEDING RELATING TO THIS AGREEMENT; (II) WAIVE, TO THE FULLEST EXTENT PERMITTED BY LAW, THE DEFENSE OF AN INCONVENIENT FORUM IN ANY ACTION OR PROCEEDING IN ANY SUCH COURT; (III) AGREE THAT A FINAL JUDGMENT IN ANY ACTION OR PROCEEDING IN ANY SUCH COURT SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN ANY OTHER JURISDICTION BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW; AND (IV) CONSENT TO SERVICE OF PROCESS UPON IT BY MAILING A COPY THEREOF BY CERTIFIED MAIL ADDRESSED TO IT AS PROVIDED FOR NOTICES HEREUNDER. SELLER AND BUYER KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY OF ANY DISPUTE ARISING UNDER OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

Section 8.11     Mediation.  Any dispute between the Parties under this Agreement shall be submitted to mediation at the election of either Party.  Seller and Buyer shall select

Exhibit 1

one mediator not affiliated with either Seller or Buyer.  If Seller and Buyer cannot agree on a mediator, then each Party shall select a mediator of its choice; and the two mediators selected by Seller and Buyer shall select a mediator of their choice not affiliated with either Seller or Buyer.  The mediator selected in accordance with this provision shall mediate between Seller and Buyer with the objective of resolving the dispute between Buyer and Seller submitted for mediation.

Section 8.12      Arbitration.  In the event the Parties have a dispute under this Agreement that cannot be amicably resolved by mediation or otherwise, upon the written demand of either Party, the Parties agree to submit the dispute to binding arbitration to JAMS in its office closest to Buyer's main office for resolution in accordance with its procedures before a single arbitrator who shall be a retired judge.  The costs of arbitration and reasonable counsel fees will be borne by the Party determined by the arbitrator to be the non-prevailing Party.  If the arbitrator does not make a finding as to whether a Party is to be considered a prevailing Party, the Parties shall share the costs of arbitration equally and each Party shall bear its own counsel and other arbitration fees.  The Parties agree to be bound by the decision of the arbitrator.

Section 8.13      Neutral Interpretation.  This Agreement and each Loan Purchase Certificate are the product of negotiations of the Parties, and in the enforcement or interpretation hereof and thereof are to be enforced and interpreted in a neutral manner, and any presumption with regard to construction or interpretation for or against any Party by reason of that Party having drafted, or caused to be drafted, this Agreement and/or any Loan Purchase Certificate, or any portion of either, shall not be effective in regard to the interpretation hereof or thereof.

Section 8.14      Entire Agreement.  This Agreement and each Loan Purchase Certificate, and any documents attached as exhibits or executed in connection herewith or therewith, constitute the Parties' entire and final agreement with respect to the subject matter hereof and thereof, and supersede all agreements, representations, warranties, statements, promises, and understandings, whether oral or written, with respect to the subject matter herewith. Neither this Agreement nor any Loan Purchase Certificate may be contradicted by evidence of prior, contemporaneous, or subsequent oral agreements of the Parties, and there are no (and shall be no) unwritten oral agreements between the Parties. The Parties make no representations or warranties to each other, except as contained in this Agreement or in the accompanying exhibits or the certificates or other Closing documents delivered according to this Agreement. Neither this Agreement nor any Loan Purchase Certificate may be changed, waived, discharged, or terminated orally, but only by an instrument in writing signed by the Party against which enforcement of such change, waiver, discharge, or termination is sought.

Section 8.15      Counterparts.  This Agreement and each Loan Purchase Certificate may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  Electronic signatures may be accepted as original signatures.

Exhibit 1

Section 8.16    Further Assurance and Acts.  From time to time, the Seller shall (i) execute and deliver to Buyer such additional documents, (ii) provide such additional information to Buyer and (iii) do such further acts, as Buyer may reasonably require to effectuate the intent and purposes of, and to carry out the terms of, this Agreement, each Loan Purchase Certificate and all Loan Documents and any agreements executed in connection herewith or therewith, which further acts may include without limitation, reasonably cooperating with Buyer to ensure that Buyer is named, promptly following the Closing Date for any particular Loan, (a) as the loss payee on each such Borrower's casualty insurance policy required by the Loan Documents for such Loan, and (b) an "additional insured" on each such Borrower's liability insurance policies required by the Loan Documents for such Loan.  Notwithstanding anything to the contrary in this Agreement or in any Loan Purchase Certificate, the failure of Buyer to identify or discover any deficiency or error with respect to any Loan File will not release Seller from its obligations to provide any other required documentation or correct any errors in accordance with the provisions of this Agreement.  Furthermore, notwithstanding anything to the contrary herein, the fact that Buyer has conducted or has determined not to conduct, any partial or complete examination of the Loan Documents shall in no event impair or diminish the rights of Buyer or any of its successors under this Agreement with respect to any breach of the representations and warranties contained in this Agreement, including but not limited to Buyer's or any if its successor's rights to demand repurchase or other relief or remedy provided for in this Agreement.

Section 8.17    Third-Party Beneficiary.  Each of Buyer and Seller hereby agrees that any other lender or agent under a leverage facility and any subsequent owner of the Loan(s) shall be a third party beneficiary to this Agreement, and entitled to enforce directly the provisions of this Agreement as if it were a party hereto.

Section 8.18    Relationships of Seller and Buyer.  The relationship between Seller and Buyer created under this Agreement shall be as seller and buyer.  Seller and Buyer are not partners or joint venturers, and neither Party shall act as agent for the other.  Except for the transactions described in this Agreement, Seller has no business or other relationship with Buyer and is not engaged in Buyer's business or other activities.  It is the intention of the Parties hereto that the sale, transfer, assignment and conveyance of Loans contemplated by this Agreement shall constitute a sale of such Loans by Seller to Buyer and not a financing transaction, borrowing, loan or any other form of transaction.  In furtherance of the foregoing, each of Seller and Buyer will treat the sale, transfer, assignment and conveyance of each such Loan hereunder as a true sale on its books and records and for accounting, tax and, to the extent applicable, regulatory purposes and will not take or assert positions which are inconsistent with the true sale treatment of this transaction.

*[SIGNATURE PAGE FOLLOWS]*

Exhibit 1

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as of the day and year first above written.

SELLER:

_ICG10 Capital, LLC_____

a _Florida Limited Liability Company_____

By: _Warren Ifergane_____
Name: _Warren Ifergane_____
Title: _CEO_____

BUYER:

PS FUNDING, INC.,
a Delaware corporation

By: _____
Name: _Sara Priola_____
Title: _Authorized Signatory_____

Exhibit 1

EXHIBIT A

FORM OF LOAN PURCHASE CERTIFICATE

LOAN PURCHASE CERTIFICATE

THIS LOAN PURCHASE CERTIFICATE (this "Loan Purchase Certificate") is entered into by and between _____, a _____ ("Buyer") and _____, a _____ ("Seller"), and is executed pursuant to and in accordance with the terms of that certain Master Loan Sale Agreement (with Loan Purchase Certificates) dated as of _____ ___, 20__ ("Master Agreement"). All capitalized terms used but not otherwise defined herein shall have the meaning afforded to such terms under the Master Agreement.

The rights and obligations of the Parties to this Loan Purchase Certificate are governed by the Master Agreement, which (i) is fully incorporated herein by reference as if set forth in full herein and (ii) shall govern the sale by Seller to Buyer of the Loans described in this Loan Purchase Certificate below.

Seller does hereby agree to sell, assign, set over and otherwise convey, and Buyer does hereby agree to purchase from Seller, all of Seller's right, title and interest to the Loans identified on Schedule "1" hereto, for a price equal to the Purchase Price set forth on Schedule "1" hereto.

Loan Purchase Certificate Date: _____ ___, 20__

Description of Loans and Purchase Price: See Schedule "1" attached to this Loan Purchase Certificate, which is incorporated herein and into the Master Agreement by reference.

Qualification of Buyer's Representations, Warranties and Covenants: The representations, warranties and covenants being made by Buyer in the Master Agreement are hereby qualified, but only as and to the extent expressly set forth, if at all, on Schedule "2" attached hereto, which is incorporated herein and into the Master Agreement by reference.

Qualification of Seller's Representations, Warranties and Covenants: The representations, warranties and covenants being made by Seller in the Master Agreement are hereby qualified, but only as and to the extent expressly set forth, if at all, on Schedule "3" attached hereto, which is incorporated herein and into the Master Agreement by reference.

[SIGNATURE PAGE FOLLOWS]

1
Exhibit "A"

Exhibit 1

IN WITNESS WHEREOF, the parties hereto have executed this Loan Purchase Certificate as of the Loan Purchase Certificate Date set forth above.

SELLER:                                    BUYER:

_____,        _____,

a(n) _____        a(n) _____

By: _____        By: _____
      Name: _____            Name: _____
      Title: _____            Title: _____

SCHEDULE 1
TO LOAN PURCHASE CERTIFICATE

LOAN DESCRIPTION

| Seller's Loan ID No. | Name of Borrower | Street Address of Properties | Zip Code | Originator | Origination Date | Maturity Date, including all extensions | Purchase Price | Outstanding Principal Amount | Coupon Rate | Fees, if any, earned by Seller | Conditions[1] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |

---

[1] Conditions to be inserted by Buyer following Loan File review.  See addenda for sample language.

3
Exhibit "A"

Exhibit 1

## LOAN PURCHASE CERTIFICATE ADDENDA
### (IF APPLICABLE)

Sample language to be used if applicable, may be revised by Buyer and other conditions may apply:

**Funding on Buyer's Platform:**

Prior to purchasing the Loan, Buyer will post the Loan on Buyer's Platform and, if Crowd Investors fill the entire loan amount, Buyer will purchase the Loan from Seller within three (3) Business Days following the fill date.  If there is not sufficient investment by Crowd Investors within twenty-one (21) days of the date on which the Loan is posted on Buyer's Platform, Buyer will not purchase the Loan and the Loan Purchase Certificate will be terminated with respect to such Loan effective as of the twenty-second (22nd) day.

**Pari Passu Position (i.e. Skin in the Game) with MDPN:**

Buyer will purchase the Loan subject to Seller holding a pari passu position in the Loan in the amount of $_____ (the "Retained Position").  Upon purchase of the Loan, Buyer will wire to Seller the Purchase Price for such Loan less the Retained Position.  The Retained Position will be evidenced by a mortgage dependent promissory note issued to Seller's investor account on peerstreet.com.  Buyer's mortgage dependent promissory note will have the same terms as those of the Crowd Investors in the Loan.

**Subordinate Position (i.e. B-Piece) with MDPN:**

Buyer will purchase the Loan subject to Seller holding a subordinate position in the Loan in the amount of $_____ (the "B-Piece"). Upon purchase of the Loan, Buyer will wire to Seller the Purchase Price for such Loan less the B-Piece.  The B-Piece will be evidenced by a mortgage dependent promissory note issued to Seller's investor account on www.peerstreet.com.  The terms of the subordination will be stated on the loan detail page for the related Loan as follows:

> This offering is a junior position ("B Piece") of the first lien on the property.  The senior position ("A-Piece") of the first lien on the property has been or will be offered separately.

> The B Piece is hereby, and shall continue to be, subject and subordinate in priority and in right of payment, as described below, to the prior payment of the indebtedness evidenced by the A-Piece and is subject and subordinate in all respects to the liens, terms, covenants and conditions of the A-Piece and to all advances by the A-Piece holder without regard to the application of such proceeds, together with all interest, prepayment premiums and all other sums due under the A-Piece.

> If no Loan default has occurred and is continuing, all amounts tendered by the Borrower or otherwise available for payment on the Loan shall be distributed and applied in the following order or priority:

> 1. First, to the to the Servicer, the due and payable servicing fees;

4

Exhibit "A"

Exhibit 1

2. Second, to the A-Piece holder pro rata up to the amount of any unreimbursed costs paid or payable by the A-piece holder;

3. Third, to the B-Piece holder pro rata up to the amount of any unreimbursed costs paid or payable by the B-piece holder;

4. Fourth, to the A-Piece holder then to the B-piece holder in an amount equal to their respective pro rata portions of the accrued and unpaid interest on the Note, with the A-Piece holder receiving its pro rata portion of each monthly interest payment first, and the B-Piece holder receiving its pro rata portion of each monthly interest payment thereafter (e.g. the A-Piece holder receives its portion of the January interest payment, then the B-Piece holder receives its portion of the January interest payment, then the A-Piece holder receives its portion of the February interest payment, then the B-Piece holder receives its portion of the February interest payment);

5. Fifth, to the A-Piece holder in an amount equal to its pro rata portion of any principal payment;

6. Sixth, to the B-Piece holder in an amount equal to its pro rata portion of any principal payment; and

7. Seventh, any default interest or other fees actually paid by Borrower in excess of interest and principal accrued on the Loan and not required to be paid to Servicer, trustee or any other party, pro rata and pari passu to the A-Piece and B-Piece holders.

If a Loan default has occurred and is continuing, all amounts tendered by the Borrower or otherwise available for payment on the Loan shall be distributed and applied in the following order or priority:

1. First, to the to the Servicer, the due and payable servicing fees

2. Second, to the A-Piece holder pro rata up to the amount of any unreimbursed costs paid or payable by the A-piece holder;

3. Third, to the A-Piece holder in an amount equal to its pro rata portion of the accrued and unpaid interest on the Note;

4. Fourth, to the A-Piece holder in an amount equal to its pro rata portion of any principal payment;

5. Fifth, to the B-Piece holder pro rata up to the amount of any unreimbursed costs paid or payable by the B-piece holder;

6. Seventh, to the B-Piece holder in an amount equal to its pro rata portion of the accrued and unpaid interest on the Note;

7. Eighth, to the B-Piece holder in an amount equal to its pro rata portion of any principal payment; and

8. Ninth, any default interest or other fees actually paid by Borrower in excess of interest and principal accrued on the Loan and not required to be paid to Servicer, trustee or any other party, pro rata and pari passu to the A-Piece and B-Piece holders.

Exhibit "A"

Exhibit 1

The A-Piece holder shall have all rights with respect to the servicing, administration, and exercise of rights and remedies with respect to the Loan, including, without limitation, the sole and exclusive authority to (i) modify or waive any of the terms of the Loan Documents, (ii) consent to any action or failure to act by the Borrower or any party to the Loan Documents, (iii) vote all claims with respect to the Loan in any bankruptcy, insolvency or other similar proceedings, and (iv) take legal action to enforce or protect the A-Piece and/or B-Piece  interests with respect to the Loan or to refrain from exercising any powers or rights under the Loan Documents, including the right at any time to call or waive any defaults or accelerate or refrain from accelerating the Loan or institute any foreclosure action.

Subordinate Position (i.e. B-Piece) without MDPN:

Buyer will purchase the Loan subject to Seller holding a subordinate position in the Loan in the amount of $_____  (the "B-Piece") which is evidenced by this Loan Purchase/Origination Certificate and subject to the terms of this Master Loan Sale/Origination Agreement.

The B Piece is hereby, and shall continue to be, subject and subordinate in priority and in right of payment, as described below, to the prior payment of the indebtedness evidenced by the A-Piece and is subject and subordinate in all respects to the liens, terms, covenants and conditions of the A-Piece and to all advances by the A-Piece holder without regard to the application of such proceeds, together with all interest, prepayment premiums and all other sums due under the A-Piece.

If no Loan default has occurred and is continuing, all amounts tendered by the Borrower or otherwise available for payment on the Loan shall be distributed and applied in the following order or priority:

1.  First, to the to the Servicer, the due and payable servicing fees;
2.  Second, to the A-Piece holder pro rata up to the amount of any unreimbursed costs paid or payable by the A-piece holder;
3.  Third, to the B-Piece holder pro rata up to the amount of any unreimbursed costs paid or payable by the B-piece holder;
4.  Fourth, to the A-Piece holder then to the B-piece holder in an amount equal to their respective pro rata portions of the accrued and unpaid interest on the Note, with the A-Piece holder receiving its pro rata portion of each monthly interest payment first, and the B-Piece holder receiving its pro rata portion of each monthly interest payment thereafter (e.g. the A-Piece holder receives its portion of the January interest payment, then the B-Piece holder receives its portion of the January interest payment, then the A-Piece holder receives its portion of the February interest payment, then the B-Piece holder receives its portion of the February interest payment);
5.  Fifth, to the A-Piece holder in an amount equal to its pro rata portion of any principal payment;
6.  Sixth, to the B-Piece holder in an amount equal to its pro rata portion of any principal payment; and

Exhibit 1

7.      Seventh, any default interest or other fees actually paid by Borrower in excess of interest and principal accrued on the Loan and not required to be paid to Servicer, trustee or any other party, pro rata and pari passu to the A-Piece and B-Piece holders.

If a Loan default has occurred and is continuing, all amounts tendered by the Borrower or otherwise available for payment on the Loan shall be distributed and applied in the following order or priority:

1.      First, to the to the Servicer, the due and payable servicing fees
2.      Second, to the A-Piece holder pro rata up to the amount of any unreimbursed costs paid or payable by the A-piece holder;
3.      Third, to the A-Piece holder in an amount equal to its pro rata portion of the accrued and unpaid interest on the Note;
4.      Fourth, to the A-Piece holder in an amount equal to its pro rata portion of any principal payment;
5.      Fifth, to the B-Piece holder pro rata up to the amount of any unreimbursed costs paid or payable by the B-piece holder;
6.      Sixth, to the B-Piece holder in an amount equal to its pro rata portion of the accrued and unpaid interest on the Note;
7.      Seventh, to the B-Piece holder in an amount equal to its pro rata portion of any principal payment; and
8.      Eighth, any default interest or other fees actually paid by Borrower in excess of interest and principal accrued on the Loan and not required to be paid to Servicer, trustee or any other party, pro rata and pari passu to the A-Piece and B-Piece holders.

The A-Piece holder shall have all rights with respect to the servicing, administration, and exercise of rights and remedies with respect to the Loan, including, without limitation, the sole and exclusive authority to (i) modify or waive any of the terms of the Loan Documents, (ii) consent to any action or failure to act by the Borrower or any party to the Loan Documents, (iii) vote all claims with respect to the Loan in any bankruptcy, insolvency or other similar proceedings, and (iv) take legal action to enforce or protect the A-Piece and/or B-Piece  interests with respect to the Loan or to refrain from exercising any powers or rights under the Loan Documents, including the right at any time to call or waive any defaults or accelerate or refrain from accelerating the Loan or institute any foreclosure action.

Exhibit 1

SCHEDULE 2
TO LOAN PURCHASE CERTIFICATE

QUALIFICATION OF
SELLER'S REPRESENTATIONS, WARRANTIES AND COVENANTS

IF AND TO THE EXTENT ANY OF THE REPRESENTATIONS, WARRANTIES AND COVENANTS BEING MADE BY SELLER UNDER ARTICLE 4 OF THE MASTER AGREEMENT ARE NOT TRUE AND CORRECT IN ALL MATERIAL RESPECTS AS OF THE DATE OF THIS LOAN PURCHASE CERTIFICATE AND AS OF THE CLOSING DATE FOR THE LOANS IDENTIFIED IN THIS LOAN PURCHASE CERTIFICATE, THEN SPECIFICALLY IDENTIFY (BY SECTION NUMBER OF THE MASTER AGREEMENT) THE EXTENT TO WHICH SUCH REPRESENTATIONS, WARRANTIES AND COVENANTS ARE NOT TRUE AND CORRECT IN ALL MATERIAL RESPECTS.

(See Article 4 of the Master Agreement)

☐      None.

OR

Section                Exception

[_____]          _____

[_____]          _____

[_____]          _____

[_____]          _____

[_____]          _____

[_____]          _____

[_____]          _____

[_____]          _____

Material Disclosures

☐      None.

OR

_____
_____

8
Exhibit "A"

Exhibit 1

EXHIBIT B

<u>ALLONGE</u>

      This Allonge is affixed to, and is hereby made a part of, that certain ___[Promissory Note]___, dated _____, 20___, in the original principal amount of $_____.00 ("<u>Note</u>"), made by _____, for the benefit of _____, a _____ ("<u>Assignor</u>"), and evidences the endorsement of the Note by Assignor as provided in that certain Master Loan Sale Agreement, dated _____, 20___, by and between Assignor and the endorsee hereon, to wit:

      The Note is hereby made PAYABLE TO THE ORDER OF [_____], at [_____].

Dated: _____, 201__     ASSIGNOR:

                    _____,
                    a _____

                    By:  _____

                        Name: _____

                        Title: _____

Exhibit 1

EXHIBIT C

<u>ASSIGNMENT AND ASSUMPTION OF LOAN DOCUMENTS</u>

THIS ASSIGNMENT AND ASSUMPTION OF LOAN DOCUMENTS ("<u>Assignment</u>"), is made as of the _____ day of _____, 201__, by and between _____, a _____ ("<u>Assignor</u>"), and _____, a _____ ("<u>Assignee</u>").

Assignor and Assignee have entered into that certain Master Loan Sale Agreement dated _____, 201__ (the "Agreement"), for the purchase and sale of those certain promissory notes and the assignment of those certain loan documents to Assignee, all as more particularly described in the Agreement. Capitalized terms not otherwise defined herein have the meanings given to them in the Agreement.

This Assignment is being made pursuant to the terms of the Agreement for the purpose of assigning to Assignee all of Assignor's rights, title and interest in and to those certain loan documents described on <u>Schedule 1</u> attached hereto (the "<u>Loan Documents</u>").

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

1.      <u>Assignment of Loan Documents</u>.  Assignor hereby grants, assigns, transfers, conveys and delivers to Assignee the Loan Documents and all of Assignor's right, title, interest, benefits and privileges thereunder, and Assignee hereby accepts such Assignment.  Notwithstanding anything to the contrary in this Assignment, Assignor shall continue to be entitled (on a non-exclusive basis) to the rights of indemnity, defense and to be held harmless provided to the lender under the Loan Documents; provided, however, that (i) nothing herein shall be construed to limit the right, title and interest of Assignee once Assignee becomes the lender under the Loan Documents, to all such rights of indemnity, defense and to be held harmless, (ii) if and to the extent Assignor's rights of indemnity, defense and to be held harmless provided to the lender under the Loan Documents conflict or compete in any way with Assignee's rights of indemnity, defense and to be held harmless provided to the lender under the Loan Documents, Assignee's rights shall have priority, and (iii) if and to the extent any amounts are recoverable from or payable by a borrower and/or any guarantor under the Loan Documents in satisfaction of such indemnity and/or defense obligations, then as between Assignee (and Buyer's Related Persons) and Assignor (and Seller's Related Persons), Assignee (and Buyer's Related Persons) shall have first priority as to same.

2.      <u>Assumption of Obligations</u>.  By acceptance of this Assignment, Assignee hereby assumes and agrees to hereafter perform and to be bound by all of the terms, covenants, conditions and obligations imposed upon or assumed by Assignor under the Loan Documents from and after the Closing (as defined in the Agreement).

3.      <u>Successors and Assigns</u>.  This Assignment shall be binding upon and inure to the benefit of the successors, assigns, personal representatives, heirs and legatees of the respective parties hereto.

4.      <u>Attorneys' Fees</u>.   In the event of the bringing of any action or suit by a Party hereto against another Party hereunder by reason of any breach of any of the covenants, conditions, agreements or provisions on the part of the other Party arising out of this Assignment, then in that event the prevailing Party shall be entitled to have and recover of and from the other Party all costs and expenses of the action or suit, including reasonable attorneys' fees.

5.      <u>Governing Law</u>.   This Assignment shall be governed by, interpreted under, and construed and enforceable with, the laws of the State of California.

6.      <u>Counterparts</u>.   This Assignment may be executed in multiple counterparts, each of which shall be deemed an original, but all of which, together, shall constitute one and the same instrument.

[SIGNATURE PAGE FOLLOWS]

Exhibit 1

IN WITNESS WHEREOF, the parties hereto have executed this Assignment as of the date first written above.

"ASSIGNOR":

a _____

By: _____

Name: _____

Title: _____

"ASSIGNEE":

a _____

By: _____

Name: _____

Title: _____

Exhibit 1

SCHEDULE "1"

TO

<u>ASSIGNMENT AND ASSUMPTION OF LOAN DOCUMENTS</u>

[LIST ALL LOAN DOCUMENTS BEING ASSIGNED TO PEER STREET]

4

Exhibit "C"

Exhibit 1

EXHIBIT D

FORM OF ASSIGNMENT OF SECURITY INSTRUMENT

RECORDING REQUESTED BY:

_____

_____

WHEN RECORDED RETURN TO:

_____

_____

_____

APN: _____

_____

ASSIGNMENT OF [DEED OF TRUST/MORTGAGE/DEED TO SECURE DEBT]

  This ASSIGNMENT OF [DEED OF TRUST/MORTGAGE/DEED TO SECURE DEBT] ("Assignment") is made this ____ day of _____, 201__, by _____, a _____ ("Assignor"), to _____, a _____ ("Assignee").

  FOR VALUE RECEIVED, Assignor hereby sells, grants, assigns, and transfers to Assignee any and all of its right, title and interest in and to that certain [Security Instrument]__, dated _____, made by _____, for the benefit of Assignor ("Security Instrument"), and recorded on _____, in the Official Records of _____ County, [_____], as Instrument Number _____, and as a lien on that certain real property described on Exhibit A, attached hereto and made a part hereof.

  TOGETHER with the note or notes therein described or referred to, the money due and to become due thereon with interest, and all rights accrued or to accrue under the foregoing Security Instrument.

*[Signature On Following Page]*

Exhibit 1

IN WITNESS WHEREOF, this Assignment is made to be effective as of the date first above written.

ASSIGNOR:

_____,
a _____

By:   _____

      Name: _____

      Title: _____

ACKNOWLEDGMENT

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

STATE OF [_____]                              )
                                                   )   ss
COUNTY OF _____                    )


On _____, before me, _____, a Notary Public, personally appeared _____, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument, and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of [_____] that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.


_____
Notary Public

3
Exhibit "E"

Exhibit 1

EXHIBIT A TO
ASSIGNMENT OF [DEED OF TRUST/MORTGAGE/DEED TO SECURE DEBT]
LEGAL DESCRIPTION OF PROPERTY

[To Be Inserted Prior To Recordation]

EXHIBIT E

FORM OF BORROWER NOTICE LETTER

[Current Servicer]
[Address]
[City, State, Zip]

[Date]
[Borrower]
[Address]
[City, State Zip]

Re: Notice of Assignment, Sale or Transfer of Servicing Rights
Our Reference:  [Acct. No. /Borrower Name]

Please be advised that effective [Transfer Date], servicing of your loan will be transferred from [Current Servicer] to [New Servicer].

This transfer of the servicing does not affect any of the terms or conditions of your mortgage documents other than terms directly related to the servicing of your loan.

Except in limited circumstances, the law requires that your present Servicer send you this notice at least 15 days before the effective date of transfer, or at closing. Your new Servicer must also send you this notice no later than 15 days after the effective date or at closing.

If you have any questions relating to the transfer of servicing from your present servicer, please call [Current Servicer Phone Number] between [____AM and ____PM] Monday through Friday.

Your new Servicer will be [New Servicer] The business address for your new Servicer is:

| CORRESPONDENCE | PAYMENTS |
|---|---|
| [New Servicer] | [New Servicer] |
| [Address] | [Address] |
| [City, State Zip] | [City, State Zip] |

If you have any questions relating to the transfer of servicing to [New Servicer], call [Current Servicer Phone Number] between [____AM and ____PM] Monday through Friday.

Your present Servicer will continue accepting payments from you through [Transfer Date Your new Servicer, [New Servicer], will begin accepting payments from you after [Transfer Date].  Send all payments due on or after that date to your new Servicer.

Exhibit 1

You should also be aware of the following information, which is set out in more detail Section 6 of the Real Estate Settlement Procedures Act (RESPA) (12 U.S.C. Section 2605):

> During the 60-day period following the effective date of the transfer of the loan servicing, a loan payment received by your old Servicer before its due date may not be treated by the new loan Servicer as late, and a late fee may not be imposed on you.

Section 6 of RESPA (12 U.S.C. section 2605) gives you certain consumer rights. If you send a "qualified written request" to your loan Servicer concerning the servicing of your loan, your Servicer must provide you with a written acknowledgment within 20 Business Days of receipt of your request. A "qualified written request" is a written correspondence, other than notice on a payment coupon or other payment medium supplied by the Servicer, which includes your name and account number, and your reasons for the request. If you want to send a "qualified written request" regarding the servicing of your loan, it must be sent to:

> New Servicer]
> [Address]
> [City, State Zip]

Not later than 60 Business Days after receiving your request, your Servicer must make any appropriate corrections to your account, and, must provide you with a written clarification regarding any dispute. During this 60-business day period, your Servicer may not provide information to a consumer reporting agency concerning any overdue payment related to such period or qualified written request. However, this does not prevent the Servicer from initiating foreclosure if proper grounds exist under the mortgage documents.

A Business Day is a day on which the offices of the business entity are open to the public for carrying on substantially all of its business functions.

Section 6 of RESPA also provides for damages and costs for individuals or classes of individuals in circumstances where Servicers are shown to have violated the requirements of that section. You should seek legal advice if you believe your rights have been violated.

Sincerely,

[Current Servicer]