1  **Pierce Bainbridge Beck Price & Hecht LLP**
    Thomas D. Warren (SBN 160921)
2   twarren@piercebainbridge.com
    Dan Terzian (SBN 283835)
3   dterzian@piercebainbridge.com
    355 S. Grand Ave., 44th Floor
4   Los Angeles, California 90071
    (213) 262-9333
5

6   *Counsel for*
7   *Defendant ICG10 Capital, LLC*

8

9

10          THE UNITED STATES DISTRICT COURT
       FOR THE CENTRAL DISTRICT OF CALIFORNIA

11

12  | PS FUNDING, INC., a Delaware corporation, | Case No. 2:19-cv-07724 |
    |---|---|

PS FUNDING, INC., a
Delaware corporation,

              Plaintiff,

        v.

ICG10 CAPITAL, LLC, a
Florida limited liability
company; and DOES 1 through
50, inclusive,

              Defendants.

Case No. 2:19-cv-07724

Hon. Dale S. Fischer

**Defendant ICG10 Capital's
Counterclaims against PS
Funding for:**

   **1. Unfair Competition;**

   **2. Unfair Trade Practices; and**

   **3. Declaratory Relief**

**DEMAND FOR JURY TRIAL**

13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1   Counterclaim-Plaintiff ICG10 Capital, LLC, alleges as follows:

2   **INTRODUCTION**

3   1.   Large nonbank lending companies making real estate loans are the
4   biggest risk to the U.S. economy. They're imprudent. And they pose major
5   problems for the broader financial system.

6   2.   These institutions could cause the next financial crisis. They're
7   significantly underregulated compared to banks. And they're raising red
8   flags to regulators and central bankers, who view the industry as helping
9   fuel a global credit bubble leaving our economy increasingly vulnerable.
10   Many of the large nonbank institutions making real estate loans could
11   collapse in value.

12   3.   Enter: PS Funding, Inc. ("PeerStreet").

13   4.   PeerStreet is a large nonbank lending company.

14   5.   PeerStreet is in the business of making real estate loans.

15   6.   PeerStreet's business model is finding ordinary Americans to
16   crowdfund real estate loans. PeerStreet then takes a percentage cut of those
17   loans.

18   7.   PeerStreet's business model used to be great. For four years, it
19   operated in a real estate environment where its investors—the ordinary
20   American crowdfunders—never lost money.

21   8.   Now it's floundering. Early 2019 marked the first time that
22   PeerStreet crowdfunders lost money on a loan. PeerStreet and its
23   crowdfunders are now experiencing even more losses.

24   9.   Stopping this hemorrhaging is critical to PeerStreet. It has already
25   lost clients for these reasons. One even noted that, in late 2018 and early
26   2019, the quality of PeerStreet loans turned bad, with PeerStreet extending
27   loans that it never should have.

28

Defendant ICG10 Capital's Counterclaims

10. PeerStreet has devised a strategy on this front: suing its competitors out of existence for losses caused by PeerStreet's failures. PeerStreet does this through a contractual provision that purports to hold liable an innocent third party—a finder who presented the possible loan to PeerStreet—by requiring them to purchase the loan.

11. PeerStreet pursues this strategy partly because it allows it to save face in front of its crowdfunders: PeerStreet passes the blame for the loss from itself to the third-party finder. PeerStreet has actively misled its crowdfunders into thinking that ICG10 Capital and brokers are responsible for conducting due diligence when they're not. PeerStreet's crowdfunders now believe (due to PeerStreet's misrepresentations to them) that ICG10 Capital performed the underwriting and due diligence on the Texas loan.

12. This is false. What actually happened is that PeerStreet performed the underwriting and due diligence. This was PeerStreet's poor investment. PeerStreet caused its crowdfunders to lose money.

13. The contractual provision that PeerStreet relies on is illegal, unconscionable, and unenforceable. PeerStreet performed all diligence on the loan. Not the finder.

14. PeerStreet decided whether or not to extend the loan to the borrower. Not the finder.

15. PeerStreet set the terms for the loan. Not the finder.

16. PeerStreet (and its crowdfunders) stood to earn the substantial profits from interest on the loan. Not the finder. The finder receives only a small referral fee.

17. When extending the loan, PeerStreet knows that the finder does not have the money to purchase the loan.

Defendant ICG10 Capital's Counterclaims

1    18.  PeerStreet's attempting to pass the blame on to others and to hold

2    them liable for PeerStreet's own errors is illegal and unconscionable. And to

3    the extent PeerStreet's contracts purport to authorize that, they are illegal

4    and void.

5                              **THE PARTIES**

6    19.  Counterclaim-Plaintiff ICG10 Capital is a Florida limited liability

7    company with its principal place of business in Florida. ICG10 Capital has

8    one member. That member is domiciled in Florida.

9    20.  Counterclaim-Defendant PeerStreet is a Delaware corporation

10   with its principal place of business in California.

11                     **JURISDICTION AND VENUE**

12   21.  This Court has subject matter jurisdiction over this action

13   pursuant to 28 U.S.C. § 1332 because the parties are citizens of different

14   states and the amount in controversy exceeds $75,000, exclusive of interests

15   and costs. This Court also has supplemental jurisdiction because this is a

16   compulsory counterclaim under 28 U.S.C. § 1367(a).

17   22.  The Court has personal jurisdiction over PeerStreet because

18   PeerStreet brought this action in this Court and thereby consented to its

19   jurisdiction. The Court also has personal jurisdiction over PeerStreet

20   because its principal place of business is in California.

21   23.  Venue is proper in this district because PeerStreet brought this

22   action in this Court and thereby consents to venue. Venue is also proper in

23   this Court because PeerStreet resides in and is subject to personal

24   jurisdiction in this district.

25

26

27

28

Defendant ICG10 Capital's Counterclaims

## FACTUAL ALLEGATIONS

### A.  Background on PeerStreet and its Business Model

24.  PeerStreet is a large nonbank lender specializing in funding fix-and-flip real estate loans.

25.  PeerStreet is a leader in this space. It has more than $1 billion of assets under its management and has transacted more than $2 billion of business. It's transacted more than 4,775 loans.

26.  PeerStreet provides a marketplace for its clients (crowdfunders) to invest in these fix-and-flip real estate loans.

27.  PeerStreet sources these loans in one of two ways.

28.  One way PeerStreet sources these loans is through partnering with lenders who already made the loans. PeerStreet and that lender agree to place the already-existing loan in PeerStreet's marketplace, for PeerStreet crowdfunders to invest in it.

29.  The other way is through table funding. A broker (finder) will present a loan opportunity to PeerStreet. PeerStreet will then evaluate whether it wants to pursue the opportunity. If it does, PeerStreet sets the terms, and PeerStreet (and its crowdfunders) fund the loan itself.

30.  PeerStreet's business model is unique in the industry because it targets lenders and brokers, not borrowers.

31.  This business model, combined with PeerStreet's dominant size in the industry, gives PeerStreet tremendous power (and market power) over these lenders and brokers. The prospect of PeerStreet cutting off lenders or brokers provides a real and existential threat to the existence of small lenders and brokers.

### B.  Table Funding

32.  Table funding involves a loan that is nominally entered by a broker (or a finder), but is actually funded by the contemporaneous advance of loan

Defendant ICG10 Capital's Counterclaims

1   funds by the lender. At the same time, all the broker's rights and interests
2   in the loan are then contemporaneously assigned to the lender.

3       33.  Table funding is key to the success of small brokerage firms. It is
4   singularly responsible for allowing them to compete and maintain an
5   identity in the marketplace.

6       34.  Brokers participating in a table funding relationship do so because
7   they do not have access to the money needed to make loans and hold them
8   until it has enough to sell on the secondary market. For this reason, brokers
9   form a table funding relationship with a lender (or multiple lenders). The
10  broker finds the loan opportunity and presents it to the lender. The lender
11  conducts diligence and decides whether to fund it. If the lender decides to
12  fund the loan, the lender sets the terms. If everyone agrees to the lender's
13  terms, the broker then closes the opportunity in its own name, the lender
14  puts up the money, and the broker assigns all its rights in the loan to the
15  lender (in exchange for a small origination fee). Eventually, if the broker
16  succeeds at creating an identity in the marketplace and establishing its
17  reputation, it will have enough assets to fund its own loans and reap
18  substantially more profits (e.g., the 8–12% interest rate that the lender
19  reaps) than the small origination fee (typically less than 1% of the loan's
20  principal balance).

21      35.  This is exactly why ICG10 Capital engages in table funding.

22      36.  ICG10 Capital is a small company operating in the space of lending
23  and brokering fix-and-flip loans. ICG10 Capital does not yet have the assets
24  required to make loans and hold them until it has enough to sell on the
25  secondary market. At the same time, ICG10 Capital also has a strong brand
26  in the marketplace, and it wishes to maintain and build upon that brand—

27

28

Defendant ICG10 Capital's Counterclaims

1   and to hopefully one day be able to fund large loans itself. For these reasons,

2   table funding is key to maintaining and building ICG10 Capital's business.

3      37.  PeerStreet and ICG10 Capital's relationship was always based

4   upon a table funding arrangement.

5      38.  PeerStreet employees acknowledged that it and ICG10 Capital

6   were engaged in table funding.

7      39.  PeerStreet and ICG10 Capital's table funding arrangement

8   functioned exactly as described above. ICG10 Capital used its brand,

9   market power, and knowhow to source potential loan opportunities. It then

10  presented those opportunities to PeerStreet.

11     40.  PeerStreet then conducted its own due diligence and decided

12  whether or not to invest in the opportunity and fund the loan.

13     41.  Sometimes PeerStreet declined the opportunity.

14     42.  Other times—like with the Florida and Texas loans alleged in the

15  First   Amended   Complaint—PeerStreet   accepted   the   opportunity.

16  PeerStreet dictated and set the loan terms.

17     43.  When PeerStreet accepted the opportunity, ICG10 Capital would

18  close the loan in its own name. At the same time, PeerStreet advanced the

19  loan funds, and ICG10 Capital assigned all its rights in the loan to

20  PeerStreet (in exchange for a 1% origination fee). (By comparison,

21  PeerStreet earned a 9.99% interest rate on the loans.)

22     44.  This is what happened with the Texas and Florida loans alleged in

23  the First Amended Complaint.

24  **C.  Master Loan Sale Agreement**

25     45.  In May 2017, ICG10 Capital and PeerStreet entered a master loan

26  sale agreement ("Agreement"). A copy of the Agreement is attached to the

27  First Amended Complaint in this action.

28

Defendant ICG10 Capital's Counterclaims

46. PeerStreet drafted the Agreement.

47. The Agreement is essentially a form document used by PeerStreet for all its master loan sale agreements.

48. ICG10 Capital lacked any ability to negotiate the terms of the Agreement. On information and belief, the same would be true for any table funding arrangements that PeerStreet has with any brokers. This is because table funders tend to be small firms operating in the marketplace. Whereas PeerStreet is an industry leader with significant market power.

49. When ICG10 Capital finds a potential loan investment opportunity, the Agreement requires that ICG10 Capital offer that opportunity to PeerStreet before anybody else.

50. All diligence obligations on whether or not to make the loan lied with PeerStreet.

51. In evaluating a loan opportunity, the Agreement *requires* that PeerStreet "review, inspect, and investigate, (or shall have affirmatively chosen not to obtain, review, inspect, or investigate) each and every aspect of the Loan in question, the Loan Documents for such Loan, the Property securing such Loan, all other Collateral securing such Loan, and all other documents, instruments, statements, records, returns, agreements, information, and other matters delivered by [ICG10 Capital] to [PeerStreet], or otherwise made available to [PeerStreet], in connection with such Loan and/or this Agreement and/or the Loan Purchase Certificate applicable to such Loan."

52. The Agreement also *requires* that PeerStreet contact ICG10 Capital "to request any document or information that [PeerStreet] believes is not contained in the Loan File and may be material to its independent evaluation of the Loan and its decision whether to purchase the Loan, and

1  [ICG10 Capital] shall provide such documents or information to the extent
2  within [ICG10 Capital's] possession or control."

3      53. PeerStreet performs extensive due diligence. It digs deep.
4  PeerStreet performs independent underwriting of submitted loans and
5  prospective loans using a combination of manual processes as well as big
6  data analytics. PeerStreet analyzes independent valuations, appraisal
7  reports, the microeconomic and retail climate of the city where the property
8  is located, environmental reports, project completion reports, capex
9  schedules, insurance, surveys, income statements, historical operating
10 financials, credit scores, the borrower's track records, and legal
11 documentation. PeerStreet ensures that each loan complies with its
12 underwriting standards.

13     54. PeerStreet is in the driver's seat in the diligence process.
14 PeerStreet tells ICG10 Capital and other brokers the results of its due
15 diligence and its decisions on whether or not to fund the loan. If it decides
16 to fund a loan, PeerStreet dictates the loan's terms. PeerStreet dictates
17 what additional information is required before proceeding with the loan
18 (such as an executed buyout partnership agreement, entity documents for
19 participants in the buyout, or an executed master lease agreement).

20     55. ICG10 Capital and brokers are very much in the role of a gopher.
21 PeerStreet tells ICG10 Capital and brokers what information PeerStreet
22 needs for its due diligence process, and PeerStreet directs them to get that
23 information from the prospective borrower. ICG10 Capital and brokers
24 comply. And the process repeats until PeerStreet has determined whether
25 or not to extend a loan.

26     56. In short, ICG10 Capital and brokers do two things: (1) present a
27 prospective loan opportunity to PeerStreet and (2) get PeerStreet any

28

Defendant ICG10 Capital's Counterclaims

1   documents it requests. That's it. ICG10 Capital and brokers have zero role
2   in determining whether or not PeerStreet extends the loan or in the terms
3   of that loan.

4       57.  ICG10 Capital and brokers don't even have an exclusive role as the
5   document gopher. PeerStreet will independently contact third parties to
6   obtain documents it desires for performing its due diligence. For instance,
7   PeerStreet will independently contact the independent appraiser and ask
8   questions about the independent appraiser's valuation of the property.

9       58.  PeerStreet performed this extensive due diligence on the Florida
10  and Texas loans. The loans cleared PeerStreet's due diligence process, and
11  PeerStreet extended the loans on terms that it set.

12      59.  When PeerStreet funded the Texas and Florida loans, PeerStreet
13  submitted the funds directly to the title closing company. PeerStreet drafted
14  the closing docs and required reports by their vendors.

15      60.  The process of extending the loans is a take-it-or-leave it basis.
16  PeerStreet and its due diligence process dictate the loans' terms. And ICG10
17  Capital and brokers lack power to negotiate any material terms.

18      61.  In fact, ICG10 Capital presented many potential loan opportunities
19  to PeerStreet. PeerStreet conducted its review and declined many of them.
20  At bottom, ICG10 Capital acted solely as a finder to present potential loan
21  investment,    and    PeerStreet    did    everything—the    diligence,    the
22  underwriting, and the term-setting—with respect to deciding on whether
23  and how it would enter a loan contract.

24      **1.   The Agreement does not apply to the what the parties
25           were doing: table funding.**

26      62.  The Agreement is a PeerStreet form document. Many of its terms
27  show that it does *not* apply to what the parties were actually doing: table
28  funding.

63. For instance, Section 4.2.6 provides that:

> All payments required to be made under the terms of the Loan Documents have been made and credited up to the Closing Date for the Loan. No Loan has been more than 30 days delinquent, without giving effect to any grace or cure period, in making required payments since origination, and as of the Closing Date, no Loan is more than 30 days delinquent (beyond any applicable grace or cure period) in making required payments. There is (a) no material default, breach, violation or event of acceleration existing under any Loan, and (b) no event (other than payments due but not yet delinquent) which, with the passage of time or with notice and the expiration of any grace or cure period, would constitute a material default breach, violation or event of acceleration, which default, breach, violation or event of acceleration, in the case of either clause (a) or clause (b), materially and adversely affects the value of the Loan or the value, use or operation of the related Property.

64. In ICG10 Capital and PeerStreet's table funding relationship, this provision makes zero sense. For every investment opportunity that ICG10 Capital presented to PeerStreet, there was no existing loan. So it was impossible for there to be any delinquency or any default under a loan.

65. Similarly, Section 2.12.2 provides "Conditions to [ICG10 Capital's] Obligations." One of those conditions was:

> Seller shall have received the Purchase Price for such Loan, and Buyer shall have paid any and all costs, fees, expenses, or pro-rations required of Buyer hereunder in connection with such Loan . . . .

66. Again, this provision makes zero sense in the context of PeerStreet and ICG10 Capital's table funding arrangement. ICG10 Capital never received the Purchase Price. That term was defined to mean the loans' principal balance. ICG10 Capital never received that because this was a table funding arrangement. Instead, ICG10 Capital received only two small origination fees totaling about $70,000.

67.  As another example, Section 4.1.2. provides that "consummation of the transactions contemplated herein . . . will not . . . render [ICG10 Capital] insolvent or without sufficient working capital." But Section 2.11 (as interpreted by PeerStreet) would do just that, and PeerStreet knew that when entering the Agreement.

## 2.   Section 2.11

68.  This incongruity between what the agreement said and what the parties were doing is also seen in Section 2.11 of the Agreement. This section provides that:

> With respect to any Loan, if the related Borrower fails to make any of the first three (3) monthly payments due to [PeerStreet] after the related Closing Date, and such failure is not due to an administrative error by the applicable servicer, [ICG10 Capital] shall, upon receipt of notice from [PeerStreet], repurchase such Loan from [PeerStreet] within five (5) Business Days of such notice at the Repurchase Price.

69.  "Repurchase Price" is defined to equal the sum of "the unpaid principal balance" of the loan, accrued interest, the amount of outstanding advances to the any services, PeerStreet's expenses incurred in transferring the loan, and additional costs and expenses.

70.  Meanwhile the "Purchase Price" for a loan—the amount ICG10 received for presenting the opportunity—was 1% of the loan's principal balance.

71.  The use of the terms "Purchase Price" and "Repurchase Price" are nonsensical here. ICG10 Capital acted as finder. It never purchased or sold a loan. Instead, it received a finder's fee.

72.  It also does not make sense and is unconscionable in practice. Under the interpretation of Section 2.11 advanced by PeerStreet, PeerStreet's decision to make a $5 million loan would result in ICG10 Capital receiving a $49,500 fee and an over $5 million liability if the

– 11 –

borrower defaulted. This is nonsensical and unconscionable where PeerStreet was the party solely responsible for deciding whether to extend a loan and on what terms.

73.  Provisions like Section 2.11 are unheard of in the table funding industry. They are certainly not custom. ICG10 Capital is a veteran of the fix-and-flip lending industry and of the table funding space; it has table funding relationships with several other lenders. ICG10 Capital it is not aware of any other instance when a lender purported to apply Section 2.11 (as interpreted by PeerStreet in this action) to the arrangement. On information and belief, no other lender besides PeerStreet imposes any remotely similar requirement.

74. When PeerStreet and ICG10 Capital entered the Agreement, PeerStreet required that ICG10 Capital provide its business bank account statements. ICG10 Capital provided PeerStreet with those account statements. The account statements showed that ICG10 Capital had less than $200,000 in its bank account.

75. After reviewing ICG10 Capital's bank account statements, PeerStreet proceeded to enter the Agreement with ICG10 Capital.

76. After that, PeerStreet funded the Texas loan (which had a principal balance of over $2.1 million) and the Florida loan (which had a principal balance over $4.9 million).

77. At the time of funding these loans, PeerStreet knew that ICG10 Capital did not and would not have the ability to purchase these loans from PeerStreet.

78. On information and belief, every table funding arrangement that PeerStreet has with any broker is purportedly governed by a contract containing terms substantively identical to Section 2.11.

# FIRST COUNTERCLAIM
## Unfair Competition (Cal. Bus. & Prof. Code § 17200)

79.  The foregoing allegations are incorporated by reference as if alleged herein.

80.  PeerStreet is engaging in an unfair and unlawful business practice, in violation of California Business & Professions Code § 17200.

81.  PeerStreet is engaging in a business practice of inserting provisions substantively identical to Section 2.11 of the Agreement into every table funding arrangement it has with any brokers.

82.  That practice is unlawful and unfair.

83.  That practice violates California Civil Code § 1670.5's provisions against enforcing unconscionable contracts. Section 2.11 and substantively identical provisions are unconscionable and so one sided as to shock the conscience. They are also procedurally unconscionable because of (among other reasons) the unequal bargaining power and because Section 2.11 was hidden in Article 2 governing the initial loan transaction, rather than where it should have been: in Article 3 and 4's representations and warranties. The master loan agreement and the loan purchase certificates routinely cross reference ICG10 Capital's obligations under the representations and warranties (such that ICG10 Capital was put on notice as to them), but not under Section 2 (such that PeerStreet tried to hide this obligation). This single sentence in Section 2.11 was obscured in the wrong section and contained no emphasis—no bold, no italics, no caps—that would draw attention to this provision.

84.  This practice violates California Civil Code § 3359. In all cases, damages must be reasonable, and a contract cannot create a right to unconscionable and grossly oppressive damages. Here, Section 2.11 (as interpreted by PeerStreet) operates to impose over $7 million in damages

Defendant ICG10 Capital's Counterclaims

where (1) PeerStreet was entirely responsible for undertaking the due diligence on whether to extend the loans, (2) PeerStreet was the sole entity that performed the due diligence, (3) PeerStreet decided to extend the loans and decided the terms of the loans, and (4) ICG10 Capital was paid a mere 1% of the origination fee (about $70,000).

85.  The practice also violates California law and public policy that a company cannot be indemnified for its own intentional acts. PeerStreet was the sole party responsible for performing diligence on the loans, the sole party responsible for deciding whether to extend the loans, and the sole party responsible for determining the loan terms. Section 2.11 (as interpreted by PeerStreet) and substantively identical provisions would remove PeerStreet's obligation to adhere to even a minimal standard of care, because any consequences from PeerStreet's errors in performing the due diligence would be shifted to ICG10 Capital or the broker.

86.  The practice violates California Civil Code § 2782. PeerStreet was the sole entity responsible for the loss or expense, and PeerStreet's conduct in this regard constituted its own, sole negligence. PeerStreet's contracts (and/or contractual rights and obligations shared) with the borrowers on the Texas and Florida loans were part of construction contracts because they provided for money on fix-and-flip projects on real estate (i.e., the borrowers were seeking the loan and PeerStreet was providing the loan for the sole purpose of a construction project on the secured property).

87.  The practice is unfair because it significantly threatens or harms competition. If PeerStreet is allowed to maintain the enforceability of Section 2.11 (as interpreted by PeerStreet), it allows PeerStreet to leverage its market dominance to force its competitors (the brokers) out of business. Those competitors are faced with two options. The first option: accept the

Defendant ICG10 Capital's Counterclaims

1  term, continue operating under its own brand, and pray that a loan never
2  defaults. But if the loan does default, the broker would then default on its
3  obligation and be subject to an obligation it cannot pay, and PeerStreet
4  would use the provision to force its competitor into bankruptcy. The second
5  option: refuse the term, refuse to do business with the market leader, and
6  pray it can find an alternative avenue available.

7      88.  The practice is unlawful and unfair because PeerStreet has misled
8  its crowdfunders into believing that ICG10 Capital performed the
9  underwriting and diligence on the Texas loan. PeerStreet's crowdfunders
10 now question ICG10 Capital's—a PeerStreet competitor—underwriting and
11 due diligence. In reality, this is entirely incorrect because it was solely
12 PeerStreet that performed the underwriting and due diligence.

13     89.  PeerStreet's unlawful and unfair business practices have directly
14 damaged ICG10 Capital by damaging its reputation in the marketplace and
15 by forcing it to incur legal fees when PeerStreet brought this action.

16     90.  ICG10 Capital is entitled to injunctive relief to prohibit PeerStreet
17 from engaging in this practice of inserting provisions substantively identical
18 to Section 2.11 into contracts governing PeerStreet's table funding
19 arrangements with its brokers.

20                      **SECOND COUNTERCLAIM**
21                   **Unfair Competition (Lanham Act)**

22     91.  The foregoing allegations are incorporated by reference as if
23 alleged herein.

24     92.  PeerStreet has committed unfair competition under the Lanham
25 Act, 15 U.S.C. § 1125.

26     93.  PeerStreet made a false or misleading statement in connection
27 with the Texas loan. PeerStreet caused its crowdfunders to believe that
28 ICG10 Capital was responsible for performing the due diligence and the

Defendant ICG10 Capital's Counterclaims

underwriting of the Texas loan. This statement was false because PeerStreet performed the due diligence and the underwriting.

94. This statement actually deceived PeerStreet's crowdfunders. It caused PeerStreet crowdfunders to seriously question ICG10 Capital's underwriting and due diligence process.

95. An example of the results of this deception:

 J W · Reply

February 11, 2019 at 3:11 PM

I am invested in the same loan. I did a little research on the borrower and it's scary that this individual was given a loan from ICG10 Capital. I seriously question their underwriting and due dilligence process.

96. The statement was material. PeerStreet crowdfunders now believe that ICG10 Capital is a subpar lender. On information and belief, they will now refuse to do any business with ICG10 Capital in the future.

97. PeerStreet placed the statement into interstate commerce. PeerStreet does business in many states, and its crowdfunders are located throughout the United States. On information and belief, PeerStreet's statement was disseminated from PeerStreet in California to PeerStreet's crowdfunders in other states.

98. ICG10 Capital has been or is likely to be injured as a result of the statement. At the very least, it has lessened the goodwill and reputation of ICG10 Capital. The crowdfunders who received these statements are likely to refuse to do business with ICG10 Capital in the future.

99. The statement was made in a connection with a commercial advertisement. PeerStreet crowdfunders are repeat players on the

secondary market for buying fix-and-flip loans. These statements came prior to the purchase/sale/transaction of any future loans/business with ICG10 Capital.

100. The statement by PeerStreet was commercial speech by an entity in commercial competition with ICG10 Capital. The statement was made for the purpose of influencing PeerStreet's consumers (the crowdfunders) to believe that ICG10 Capital was at fault—when in reality PeerStreet was at fault. This statement was for the purpose of influencing PeerStreet's consumers to continue to do business with PeerStreet's. On information and belief, the number of crowdfunders on the Texas loan that the statement was disseminated to was large because the smallest investment denomination (at the time) was $1,000.

101. ICG10 Capital has suffered damages from PeerStreet's unfair competition.

### THIRD COUNTERCLAIM
### Unfair Trade Practices

102. The foregoing allegations are incorporated by reference as if alleged herein.

103. PeerStreet is engaged in an unfair trade practice.

104. The Agreement is an illegal contract because of Section 2.11 (as interpreted by PeerStreet), so PeerStreet cannot recover on it. Cal. Bus. & Professions Code § 17051. The Agreement is therefore void, illegal, and wholly unenforceable.

105. Any PeerStreet contract containing a term substantively identical to Section 2.11 that purports to govern a table funding arrangement with a broker is also illegal.

106. PeerStreet's unfair trade practices have damaged ICG10 Capital in an amount to be shown at trial. ICG10 Capital is entitled to treble

damages for PeerStreet's unfair trade practices, as well as its reasonable legal fees and costs. Cal. Bus. & Prof. Code § 17082.

107. ICG10 Capital is further entitled to injunctive relief to prevent PeerStreet's further unfair trade practices. Cal. Bus & Prof. Code § 17070.

## FOURTH COUNTERCLAIM
### Declaratory and Injunctive Relief

108. The foregoing allegations are incorporated by reference as if alleged herein.

109. As a result of the acts described in the preceding paragraphs, there exists a controversy of sufficient immediacy and reality to warrant the issuance of a declaratory judgment of illegality and invalidity of any and all PeerStreet contracts containing terms substantively identical to Section 2.11 that purportedly apply to table funding relationships.

110. A judicial declaration is necessary and appropriate so that ICG10 Capital may ascertain its rights.

111. ICG10 Capital is entitled to a declaratory judgment that all PeerStreet contracts containing terms substantively identical to Section 2.11 that purportedly apply to table funding relationships are illegal, invalid, and unenforceable.

112. ICG10 Capital seeks a permanent injunction to prevent PeerStreet from inserting or enforcing contracts containing terms substantively identical to Section 2.11 that purportedly apply to table funding relationships.

## PRAYER OF RELIEF

113. ICG10 Capital prays for relief against PeerStreet as follows:

    i.    For compensatory damages;

    ii.    For punitive damages;

    iii.    For ICG10 Capital's legal fees and costs;

Defendant ICG10 Capital's Counterclaims

| | | |
|---|---|---|
| 1 | iv. | For declaratory and injunctive relief; |
| 2 | v. | For pre- and post-judgment interest; and |
| 3 | vi. | For any other relief that the Court deems appropriate. |

Dated: October 7, 2019

**Pierce Bainbridge Beck Price & Hecht LLP**

Dan Terzian

*Counsel for*
*Defendant ICG10 Capital, LLC*

Defendant ICG10 Capital's Counterclaims